IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**RICHARD ALEXANDER, BENNIE COLLUM,**                    **PLAINTIFFS**
**DON DAVIS, DUANE GRIMES, JOHN HOUPT,**
**JOHN HOWLAND, JASON PHILLIPS,**
**DWAYNE PRITCHARD, RANDY SCHROEDER,**
**KYLAN UTLEY and ROBERT McNEIL**


vs.                           No. 4:13-cv-650-BSM


**TUTLE AND TUTLE TRUCKING, INC.;**                    **DEFENDANTS**
**TOMMY PAUL TUTLE, Individually and as Officer and**
**Director of TUTLE AND TUTLE TRUCKING, INC.;**
**and GARY TUTLE, Individually and as Officer and**
**Director of TUTLE AND TUTLE TRUCKING, INC.;**
**SCHLUMBERGER LIMITED (SCHLUMBERGER N.V.);**
**SCHLUMBERGER TECHNOLOGY CORPORATION; and**
**SCHLUMBERGER TECHNOLOGIES, INC.**


**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**


**I.        INTRODUCTION**

The Fair Labor Standards Act ("FLSA") and the Arkansas Minimum Wage Act

("AMWA") generally require payment of an overtime premium to employees who work

more than forty hours per week, unless an exemption applies.  The Motor Carrier Act

Exemption ("MCA Exemption") applies to truck drivers if they are expected to drive

across state lines as part of their ordinary job duties, unless such interstate driving is *de*

*minimis.*

**Page 1 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

During the relevant time, Tutle and Tutle Trucking, Inc. ("T&T") owned and operated its own tractor-trailers used for hauling frack sand to shale oil wells.  In addition to operating its own trucks, around January 16, 2012, T&T began operating a special fleet of trucks, which were owned by Separate Defendant Schlumberger Technology Corporation ("SLB"), dedicated to oil wells located in Arkansas.

While recruiting individuals to drive SLB trucks, T&T consistently said that drivers assigned to SLB trucks ("SLB Drivers") would drive only in Arkansas and would be paid a salary for 60 hours per week.  Each Plaintiff was an SLB Driver for a period of time. Consistent with T&T's promises, SLB Drivers primarily hauled frack sand in Arkansas for approximately a year and a half, from January of 2012 through mid-July of 2013.  For this period of time, the few occasions on which Plaintiffs drove outside of Arkansas involved extraordinary circumstances not related to their primary duty of hauling frack sand, such as bringing the trucks for inspections or relocating equipment.

Plaintiffs brought this lawsuit to recover unpaid overtime wages pursuant to the FLSA and AMWA for the limited period of time in which they worked as SLB Drivers. See Embedded chart on next page.

This brief explains why summary judgment should be granted to Plaintiffs as follows: (1) an employer-employee relationship existed between each Plaintiff and T&T, Section VII.A. infra., (2) each Plaintiff's employer-employee relationship with T&T satisfied the "coverage" requirements of the FLSA and AMWA, Section VII.B. infra., (3) the Motor Carrier Act Exemption ("MCA Exemption") under the FLSA and AMWA does **not** apply to Plaintiffs, Sections VII.C–D infra., and (4) the proper method of calculating

**Page 2 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

each Plaintiff's regular rate is dividing the weekly rate by 60 hours per week and the proper method of calculating each Plaintiff's overtime rate is 0.5 times the regular rate for all hours over 40 up to 60 per week and 1.5 times the regular rate for all hours over 60 per week, Section VIII, <u>infra</u>.

**Page 3 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**



   * Each Plaintiff seeks overtime wages only for the period of time represented in green.  That is the period of time in which each Plaintiff was designated as an SLB Driver and their ordinary job duties consisted of hauling frack sand to shale oil wells located in Arkansas.  The red color shows the period of time when each Plaintiff was employed by T&T, but was designated to drive Tutle trucks. Plaintiffs do not seek overtime pay for the time in which they were designated to drive Tutle trucks.

**Page 4 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

## II.      TABLE OF CONTENTS

I.      **INTRODUCTION** ............................................................................... 1

II.     **TABLE OF CONTENTS** ................................................................... 5

III.    **TABLE OF AUTHORITIES** ............................................................... 7

IV.     **TABLE OF EXHIBITS** ...................................................................... 9

V.      **BACKGROUND** ............................................................................. 11

VI.     **STANDARD OF REVIEW** .............................................................. 20

VII.    **ELEMENTS OF AND DEFENSES TO LIABILITY** ......................... 21

  A.    **An Employer-Employee Relationship Existed Between Plaintiffs and Separate Defendant Tutle and Tutle Trucking, Inc., During the Relevant Time.** ..................................................................................... 22

  B.    **The Employer-Employee Relationship Between Plaintiffs and Separate Defendant Tutle and Tutle Trucking, Inc., Satisfied the "Coverage" Requirement of the Fair Labor Standards Act and the Arkansas Minimum Wage Act During the Relevant Time.** ..................... 24

  C.    **The Motor Carrier Act Exemption to the Overtime Requirements of the Fair Labor Standards Act and the Arkansas Minimum Wage Act Does Not Apply to Plaintiffs for at Least Some of the Time in Which Plaintiffs Were Designated as Schlumberger Drivers.** .......................................... 27

    1.  The Motor Carrier Act exemption does *not* apply to drivers who are not expected to regularly drive in interstate commerce in the ordinary course of their duties or whose participation in interstate commerce is *de minimis*. ..... 27

      a.  *An employee who works in excess of 40 hours per week is entitled to be paid time and a half for all hours over 40, unless the employee is subject to the MCA Exemption.* ........................................................... 28

      b.  *The interstate nature of an employee's job must be an expected or regular part of the job, and not de minimis.* ........................................... 33

    2.  Plaintiffs were not expected to regularly drive in interstate commerce and the connection between their duties and interstate commerce was *de minimis* from the beginning of their designation or hiring as SLB Drivers until at least mid-July of 2013. ........................................................... 43

    3.  Plaintiffs Who Were Still Working as SLB Drivers in Mid-July of 2013 Were Not Expected to Regularly Drive in Interstate Commerce Through the End of the SLB Driving Job Position, Despite a Temporary Assignment to Oklahoma and Texas. ................................................................. 57

**Page 5 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

**D.    The MCA Exemption Cannot Apply to Certain Plaintiffs in this Case Because T&T Undermined the Public Policy Goals of the MCA Exemption. .................................................................................... 60**

**VIII.    CALCULATION OF DAMAGES .................................................... 63**

**A.    Plaintiffs' Regular Rate and Overtime Rate are Calculated Based upon a 60 Hour Workweek and the Fluctuating Work Week Method of Calculating Damages Does not Apply. ............................................. 63**

    1.    If an employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate ................................................................... 64

    2.    Each Plaintiff's salary as an SLB Driver was intended to compensate each plaintiff for sixty hours per week. .............................................. 69

**IX.    CONCLUSION .............................................................................. 71**

**Page 6 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

## III.   TABLE OF AUTHORITIES

**Cases**

Allen v. Coil Tubing Servs., L.L.C., No. H-08-3370, 2012 U.S. Dist. LEXIS 2573 (S.D. Tex. Jan. 10, 2012) ................................................................................................ 34

Archie v. Gran Cent. Partnership, Inc., 997 F.Supp. 504 (S.D.N.Y. 1998) .................... 25

Barrios v. Suburban Disposal, Inc., No. 2:12-cv-03663 (WJM), 2013 U.S. Dist. LEXIS 175155 (D.N.J. Dec. 11, 2013) .......................................................................... 38, 55

Beauford v. ActionLink, LLC, No. 13-3265, No. 13-3380, 2015 U.S. App. LEXIS 4539 (8th Cir. Mar. 20, 2015) ................................................................................................ 31

Benshoff v. City of Va. Beach, 180 F.3d 136 (4th Cir. 1999) ......................................... 25

Boekemeier v. Fourth Universalist Soc'y, 86 F. Supp. 2d 280 (S.D.N.Y. 2000).............. 25

Cerutti v. Frito Lay, Inc., 777 F. Supp. 2d 920 (W.D. Pa. 2011)...................................... 29

Coleman v. Jiffy June Farms, Inc., 324 F. Supp. 664 (S.D. Ala. 1970) ...................passim

D'Arpa v. Runway Towing Corp., No. 12-CV-1120, 2013 U.S. Dist. LEXIS 85697 (E.D.N.Y. June 18, 2013) ................................................................. 28, 29, 31, 60

Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266 (S.D.N.Y. 2008) ....passim

Dole v. Circle "A" Constr., Inc., 738 F. Supp. 1313 (D. Idaho 1990)............. 37, 40, 43, 56

Flowers v. Regency Transp., Inc., 535 F. Supp. 2d 765 (S.D. Miss. 2008).............passim

Friedrich v. U.S. Computer Services, 974 F.2d 409 (3d Cir. 1992) ................................. 38

Goldberg v. Faber Industries, Inc., 291 F.2d 232 (7th Cir. 1962) .................................. 29

Hoffman v. First Student, Inc., No. AMD 06-1882, 2009 U.S. Dist. LEXIS 53542 (D. Md. June 23, 2009).......................................................................................................... 39

Kimball v. Goodyear Tire & Rubber Co., 504 F. Supp. 544 (E.D. Tex. 1980)..... 40, 42, 53

Levinson v. Spector Motor Service, 330 U.S. 649 (1947)............................................... 30

Lieberman v. Corporate Connection Lines, Inc., No. 03-CIV-22814-HOEVELER, 2005 U.S. Dist. LEXIS 45222 (S.D. Fl. April 21, 2005) ................................................ 39, 56

Locke v. St. Augustine's Episcopal Church, 690 F. Supp. 2d 77 (E.D.N.Y. 2010).......... 25

Madden v. Lumber One Home Ctr., No. 4:10CV01162 JLH, 2013 U.S. Dist. LEXIS 30028 (E.D. Ark. Mar. 5, 2013) ........................................................... 67, 68, 69, 70

Masson v. Ecolab, Inc., No. 04 Civ. 4488 (MBM), 2005 U.S. Dist. LEXIS 18022 (S.D.N.Y. Aug. 17, 2005).......................................................................................passim

McCall v. DAV, 723 F.3d 962 (8th Cir. 2013) ................................................................. 28

Mitchell v. Kroger Co., 248 F.2d 935 (8th Cir. 1957)...................................................... 25

Morgan v. Family Dollar Stores, 551 F.3d 1233 (11th Cir. 2008) ................................... 21

Morris v. McComb, 332 U.S. 422 (1947) ...............................................................passim

Overnight Motor Transp. Co. v. Missel, 316 U.S. 572 (1942) .................................. 67, 68

Phillips v. Oil Patch Water & Sewer Servs., LLC, No. 4:11-cv-776-JLH (E.D. Ark. Aug. 8, 2012) ................................................................................. 29, 33, 39, 55

Pritchett v. Werner Enters., No. 12-0182-WS-C, 2013 U.S. Dist. LEXIS 121430 (S.D. Ala. Aug. 27, 2013) ................................................................. 38, 40, 55, 57

Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695 (1947) ........................................ 30

Reich v. American Driver Serv., 33 F.3d 1153 (9th Cir. 1994) ........................................ 38

**Page 7 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Seagram v. David's Towing & Recovery, Inc., No. 3:14-CV-414, 2014 U.S. Dist. LEXIS
    148721 (E.D. Va. Oct. 17, 2014) ............................................................ 38
Specht v. City of Sioux Falls, 639 F.3d 814 (8th Cir. 2011) ............................... 25
United States v. Lopez, 514 U.S. 549, 552 (1995) .......................................... 34
Urnikis-Negro v. American Family Prop. Servs., 616 F.3d 665 (7th Cir. 2010) .............. 68
Velez v. New Haven Bus Serv., No. 3:13cv19 (JBA), 2015 U.S. Dist. LEXIS 1275 (D.
    Conn. Jan. 6, 2015) ................................................................ 34, 36, 40
Wirtz v. C & P Shoe Corp., 336 F.2d 21 (5th Cir. 1964) .................................... 38
Yellow Transit Freight Lines, Inc. v. Balven, 320 F.2d 495 (8th Cir. 1963) ................ 37

## Statutes, Rules, & Regulations

29 C.F.R. § 778.113 (LEXIS 2015) .......................................................... 64
29 C.F.R. § 778.114 (LEXIS 2015) ...................................................... 67, 68
29 C.F.R. § 778.322 (LEXIS 2015) .......................................................... 65
29 C.F.R. § 778.323 (LEXIS 2015) ...................................................... 65, 66
29 C.F.R. § 778.325 (LEXIS 2015) .................................................. 66, 67, 70
29 C.F.R. § 782.2 (LEXIS 2015) ............................................................ 29
29 C.F.R. § 782.2(b)(2) (LEXIS 2015) .............................................. 30, 31, 34
29 C.F.R. § 782.2(b)(3) (LEXIS 2015) .......................................... 33, 34, 36, 55
29 C.F.R. § 782.7 (LEXIS 2013) ............................................................ 32
29 C.F.R. § 782.7(a) (LEXIS 2015) ......................................................... 31
29 C.F.R. § 787.2(b)(4) (LEXIS 2015) .................................................. 34, 35
29 C.F.R. § 787.7 (LEXIS 2015) ............................................................ 32
29 U.S.C.S. § 202 (LEXIS 2015) ............................................................ 60
29 U.S.C.S. § 203 (LEXIS 2015) ............................................................ 25
29 U.S.C.S. § 203(b) (LEXIS 2015) ......................................................... 25
29 U.S.C.S. § 203(d) (LEXIS 2015) ......................................................... 23
29 U.S.C.S. § 203(e) (LEXIS 2015) ......................................................... 23
29 U.S.C.S. § 207 (LEXIS 2015) ........................................................ 21, 24
29 U.S.C.S. § 213 (LEXIS 2015) ........................................................ 21, 28
29 U.S.C.S. § 216(b) (LEXIS 2015) ......................................................... 63

## Constitutional Provisions

U.S. Const. art. I, § 8 ................................................................... 34

**Page 8 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

# IV. TABLE OF EXHIBITS[1]

| Exhibit | Description |
|---|---|
| 1 | Defendant Tutle & Tutle's Answers to Plaintiff Richard Alexander's First Set of Interrogatories and Requests for Production |
| 2 | Plaintiff Richard Alexander's Deposition Excerpts ("Alexander Dep.") |
| 3 | Plaintiff Richard Alexander's Resignation/Termination Sheet |
| 4 | Plaintiff Richard Alexander's Schlumberger E-Journey Report |
| 5 | Plaintiff Duane Grimes's Deposition Excerpts ("Grimes Dep.")[2] |
| 6 | Plaintiff Duane Grimes's Schlumberger E-Journey Report |
| 7 | Plaintiff Benny Collum's Deposition Excerpts ("Collum Dep.") |
| 8 | Plaintiff Benny Collum's Schlumberger E-Journey Report |
| 9 | Plaintiff Dwayne Pritchard's Deposition Excerpts ("Pritchard Dep.") |
| 10 | Plaintiff Dwayne Pritchard's Schlumberger E-Journey Report |
| 11 | Plaintiff Robbie McNeal's Deposition Excerpts ("McNeal Dep.") |
| 12 | Plaintiff Don Davis's Deposition Excerpts ("Davis Dep.") |
| 13 | Plaintiff Don Davis's Schlumberger E-Journey Report |
| 14 | Plaintiff Kylan Utley's Deposition Excerpts ("Utley Dep.") |
| 15 | Plaintiff Kylan Utley's Schlumberger E-Journey Report |
| 16 | Plaintiff John Houpt's Deposition Excerpts ("Houpt Dep.") |
| 17 | Plaintiff John Houpt's Schlumberger E-Journey Report |
| 18 | Plaintiff Jason Phillips's Deposition Excerpts ("Phillips Dep.") |
| 19 | Plaintiff Randy Schroeder's Deposition Excerpts ("Schroeder Dep.") |
| 20 | Plaintiff Randy Schroeder's Schlumberger E-Journey Report |
| 21 | Plaintiff John Howland's Deposition Excerpts ("Howland Dep.") |
| 22 | Plaintiff John Howland's Schlumberger E-Journey Report |
| 23 | Copy of BHP Billiton Inc. Press Release re: Purchase of Chesapeake's Arkansas Shale Oil Assets, available at http://www.bhpbilliton.com/home/investors/news/Pages/Articles/BHP%20Billiton%20Announces%20Acquisition%20Of%20Chesapeake%20Energy%20Corporation's%20Fayetteville%20USA,%20Shale%20Assets.aspx |
| 24 | Copy of Wall Street Journal news article re: BHP Purchase of Chesapeake's Arkansas Shale Oil Assets, available at http://www.wsj.com/articles/SB10001424052748703800204576158834108927732 |

---

[1]    This Table of Exhibits, including the exhibit numbers and shorthand abbreviations, are intended to apply to the Statement of Undisputed Material Facts, in addition to this Brief.

[2]    Plaintiff Duane Grimes sat for his deposition on two separate days: March 16, 2015, and March 30, 2015.  Unless otherwise noted, the citation "Grimes Dep." refers to Duane Grimes's deposition of March 16, 2015.  The March 30 deposition will be cited as, for example, "Grimes Dep. 20:1–4, March 30, 2015."

**Page 9 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

| | |
|---|---|
| 25 | Copy of New York Times news article re: BHP Purchase of Chesapeake's Arkansas Shale Oil Assets, available at http://query.nytimes.com/gst/fullpage.html?res=950CE5D7153CF931A15751C0A9679D8B63 |
| 26 | Copy of Bloomberg Business news article re: BHP Purchase of Chesapeake's Arkansas Shale Oil Assets, available at http://www.bloomberg.com/news/articles/2011-02-21/bhp-buys-chesapeake-unit-for-4-75-billion-adding-u-s-shale-gas-assets |
| 27 | Liability Analysis Spreadsheet |

**Page 10 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

## V.        BACKGROUND

Separate Defendant Tutle and Tutle Trucking, Inc. ("T&T"), provides trucking services for hydraulic fracturing companies (a.k.a. "fracking companies") by hauling fracking sand to oil well sites.  Tutle & Tutle Trucking, Inc.'s Answer to Second Am. and Substituted Compl. ("Tutle Answ.") ¶ 24, ECF No. 25; Ex. 1, Answer to Interrog. No. 3 ("T&T is an interstate trucking company.  T&T trucks provide transportation of product, including but not limited to sand . . . ."); see also, Decl. of Bill Smith ("Smith Decl.") ¶¶ 3–8, ECF No. 10-2 (explaining that T&T has been transporting these types of commodities in and out of the State of Arkansas since 2009).

During the relevant time, T&T owned and operated its own tractor-trailers ("T&T trucks" or "Tutle trucks") used for hauling fracking sand.  Tutle Answ. ¶ 57.  In addition to operating its own trucks, around January 16, 2012, T&T began operating a special dedicated fleet of trucks owned by Separate Defendant Schlumberger Technology Corporation or one of its affiliates, parents, or subsidiaries ("SLB").  See Tutle Answ. ¶ 58; Grimes Dep. 28:3–19 ("they call them dedicated"); Ex. 6 Bates D-00101 (showing first operating date of January 16, 2012).  This dedicated fleet that T&T operated eventually reached twelve total trucks.  See Smith Decl. ¶ 35, ECF No. 8-2 (referring to Schlumberger's twelve trucks).

Prior to T&T's acquisition of the SLB fleet, BHP Billiton Ltd. ("BHP") purchased Chesapeake Energy Corp.'s ("Chesapeake") shale gas assets located in Arkansas.  See Collum Dep. 23:19–24:3 (explaining that Gumpenberger told Collum that SLB trucks were dedicated to the BHP oil shale wells that BHP purchased from

**Page 11 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Chesapeake); Ex. 23, BHP Billiton, *BHP Billiton Announces Acquisition of Chesapeake Energy Corporation's Fayetteville USA, Shale Assets*, www.bhpbilliton.com (Feb. 22, 2011),

http://www.bhpbilliton.com/home/investors/news/Pages/Articles/BHP%20Billiton%20Announces%20Acquisition%20Of%20Chesapeake%20Energy%20Corporation's%20Fayetteville%20USA,%20Shale%20Assets.aspx (explaining that BHP had agreed to purchase Chesapeake's shale oil assets in Arkansas); Ex. 24, Gina Chon and Robert Guy Matthews, *BHP to Buy Chesapeake Shale Assets*, www.wsj.com (Feb. 22, 2011), http://www.wsj.com/articles/SB10001424052748703800204576158834108927732

(same); Ex. 25, Michael J. De La Merced, *BHP Billiton Buys Shale Gas Assets in Arkansas*, www.nytimes.com (Feb. 22, 2011), http://query.nytimes.com/gst/fullpage.html?res=950CE5D7153CF931A15751C0A9679D8B63 (same); Ex. 26, James Paton, *BHP to Buy Chesapeake Shale Gas Assets for $4.75 Billion*, www.bloomberg.com (Feb. 22, 2011), http://www.bloomberg.com/news/articles/2011-02-21/bhp-buys-chesapeake-unit-for-4-75-billion-adding-u-s-shale-gas-assets (same).

Relatedly, SLB entered into an agreement with BHP that obligated SLB to frack the Arkansas shale gas wells that BHP purchased from Chesapeake.  See McNeal Dep. 30:21–23 (affirming that Schlumberger was doing the work at the BHP wells); Pritchard Dep. 37:23–40:13 (describing an incident that occurred "on the BHP well") (noting that BHP and Schlumberger "worked together").

**Page 12 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Meanwhile, around March of 2011, SLB and T&T entered into an agreement for T&T to provide SLB with T&T drivers to operate a dedicated fleet of SLB's trucks.  See Smith Decl. ¶ 31, ECF No. 8-2 (admitting that the Defendants entered into an agreement); Grimes Dep. 28:3–19 ("they call them dedicated . . . Q. . . . who is they? . . . A. . . . Josh and Mike, Mikal"); see also, Collum Dep. 23:19–24:3 (describing how Mikal Gumpenberger told Collum that the SLB trucks were dedicated to BHP shale gas wells in Arkansas).  Pursuant to this agreement, SLB gave possession of a fleet of trucks to T&T to operate.  See Tutle Answ. ¶ 58.  When some Plaintiffs rode to Louisiana to drive the SLB trucks back to Arkansas, T&T supervisors referred to the SLB trucks as a "dedicated fleet."  Grimes Dep. 28:3–19 ("they call them dedicated . . . Q. . . . who is they? . . . A. . . . Josh and Mike, Mikal").  T&T then hired or otherwise designated some T&T drivers, including Plaintiffs, to haul frack sand primarily in SLB trucks ("SLB Drivers").  T&T Answ. ¶ 62; Smith Decl. ¶ 31–32, ECF No. 8-2.

Either T&T, or SLB, or both, "dedicated" this fleet of SLB trucks to service the shale gas wells in Arkansas that BHP purchased from Chesapeake for some indefinite period of time.  Cf. Collum Dep. 23:19–24:3 (describing how Mikal Gumpenberger told Collum that the SLB trucks were dedicated to the shale oil wells in Arkansas that BHP bought from Chesapeake); McNeal Dep. 28:9–13, 30:10–14 (explaining that Mikal Gumpenberger told McNeal that he would stay in Arkansas as an SLB Driver because SLB Drivers were intended to work strictly on BHP wells); Smith Decl. ¶ 35, ECF No. 8-2, (explaining that around October of 2013, "Schlumberger chose to **reassign their twelve (12) trucks to . . . Oklahoma** . . . .").  Mikal Gumpenberger, a T&T manager,

**Page 13 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

specifically told Plaintiff Collum that the fleet of SLB trucks were "dedicated" to BHP shale oil wells in Arkansas.  Collum Dep. 23:19–24:3.  Mikal Gumpenberger also told Plaintiff McNeal that, if McNeal agreed to drive one of the SLB trucks, then McNeal would stay in Arkansas because the SLB trucks were dedicated strictly to BHP wells. McNeal Dep. 28:9–13, 30:10–14.

T&T operated the dedicated fleet of SLB trucks until around October of 2013, when SLB chose to reassign their dedicated fleet of twelve trucks from Arkansas to Oklahoma.  Smith Decl. ¶ 35, ECF No. 8-2, (explaining that around October of 2013, "Schlumberger chose to **reassign their twelve (12) trucks to . . . Oklahoma** . . . .").

Plaintiffs are current or former employees of T&T.  Tutle Answ. ¶ 10.   Each Plaintiff was a designated SLB Driver for some period of time.  T&T Answ. ¶ 63. While Plaintiffs worked as SLB Drivers, other drivers continued to drive for T&T primarily in T&T's company-owned trucks ("T&T Drivers").  T&T Answ. ¶ 64.

Plaintiff Richard Alexander ("Alexander") worked for T&T from February 10, 2010, through September 18, 2013, see Ex. 3., and worked as an SLB Driver from August 24, 2012, through August 29, 2013.  See generally, Ex. 4.

Plaintiff Duane Grimes ("Grimes") worked for T&T from August 13, 2010, through October 13, 2013.  Grimes Dep. 18:2–4, 17–25.  Grimes worked as an SLB Driver from January 16, 2012, through September 7, 2013.  See generally, Ex. 6 (showing a first date of 1/16/2012 and a last date of 9/7/2013).

Plaintiff Benny Collum ("Collum") worked for T&T from August 7, 2010, through December 17, 2012. Collum Dep. 17:18–20, 37:22–24.  Collum worked as an SLB

**Page 14 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Driver from January 29, 2012, through December 17, 2012.  Collum Dep. 22:3–5, 37:22–24.

Plaintiff Dwayne Pritchard ("Pritchard") began working for T&T on July 21, 2011, Pritchard Dep. 20:6–20 (noting that he remembers that day specifically because "it was a hot booger" and that he was "sweating like a hog"), and is still employed with T&T. Pritchard worked as an SLB Driver from May 9, 2012, through June 5, 2013.  See generally, Ex. 10 (showing the first record as May 9, 2012, and the last record as June 5, 2013).

Plaintiff Robbie McNeal ("McNeal") worked for T&T from August 18, 2010, through May 3, 2013.  McNeal Dep. 17:12–17.  McNeal worked as an SLB Driver from April 22, 2012, through May 3, 2013.  McNeal Dep. 28:3–6.

Plaintiff Don Davis ("Davis") worked for T&T from August 6, 2011, through May 1, 2013.  Davis Dep. 18:2–5, 22:17–19.  Davis worked as an SLB Driver from January 30, 2012, through May 1, 2013.  See Ex. 13 (showing a starting date of 1/30/2012); Davis Dep. 22:17–19 (stating last day of work was May 1, 2013).

Plaintiff Kylan Utley ("Utley") worked for T&T from December 17, 2010, through August 22, 2011, and then again from October of 2011 through January 20, 2014.  Utley Dep. 31:1–32:14.  Utley worked as an SLB Driver from January 18, 2012, through July 2, 2013.  See Ex. 15 (showing a starting date of 1/18/2012 and an ending date of 7/2/2013).

Plaintiff John Houpt ("Houpt") worked for T&T from March 14, 2013, through September 6, 2013.  See generally, Ex. 17 (showing a first record for 3/14/2013 and a

**Page 15 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

last record for 9/6/2013); see also, Houpt Dep. 106:25–107:4 (stating that he quit in September of 2013).  Houpt worked as an SLB Driver during his entire tenure at T&T. Houpt Dep. 31:19–21 (stating he was hired in as an SLB Driver), 107:5–12 (stating that he quit working for T&T because they wanted to permanently move him to driving Tutle trucks).

Plaintiff Jason Phillips ("Phillips") worked for T&T from January 15, 2013, through September of 2013, Phillips Dep. 26:5–8, 29:11–16.  Phillips worked as an SLB Driver during his entire tenure with T&T.  See Phillips Dep. 26:5–8 (stating that he hired in as an SLB Driver), Phillips Dep. 92:1–93:25 (stating that he quit when T&T informed him that T&T planned to transfer Phillips to Tutle trucks and send him to North Dakota).

Plaintiffs' primary duty as SLB Drivers was to haul frack sand to Arkansas well sites.  See Alexander Dep. 18:2–4, 21:22–24, 27:5–9, 29:10–15, 30:7–10, 31:2–23, 39:6–10, 43:7–17, 47:25–48:2 (discussing sand hauling duties); Grimes Dep. 22:17–19, 34:9–35:1, 39:8–40:20, 52:4–17 (same); Collum Dep. 17:21–23, 27:1–28:4, 32:7–9, 53:10–54:8 (same); Pritchard Dep. 21:2–5, 30:3–10, 54:18–55:5, 57:14–17, 64:18–65:4 ("We just kept the sand to the frac and we kept it going. . . . That was my job with my truck and everybody rode together and went to the well with the sand, delivery."), 70:2–13, 77:17–23, 78:1–8; McNeil Dep. 33:12–18, 74:12–18 (same); Davis Dep. 18:2–20, 41:15–42:7 (discussing sand hauling duties); Utley Dep. 39:23–25, 42:2–7, 51:23–52:2, 54:15–56:13, 107:4–6 (same); Houpt Dep. 31:25–32:15 (same); Phillips Dep. 30:14–31:10 (explaining that, after he would tell dispatch that he was over his legal limit of hours, dispatch would say, "The well is going to run out of sand . . . we got to have

**Page 16 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

somebody."); 33:13–34:6 (explaining sand delivery process), 37:5–17 (would work in the

shop, not hauling sand, only three to four days per month) 84:3–7; Schroeder Dep.

52:6–53:22 (describing waiting time, "demerge time," and role of SLB Drivers as

"demerge busters"), 88:3–93:8 (describing overall process of loading, driving, and

unloading sand); 97:2–4 (spent only two days moving equipment); Howland Dep.

49:15–21, 53:25–53:4, 59:6–65:13, 67:4–10, 83:25–84:21 (only two or three equipment

moves), 92:25–93:3, 100:6–22; T&T Answ. ¶ 62; Ex. 1, Answer to Interrog. No. 3 ("T&T

is an interstate trucking company.   T&T trucks provide transportation of product,

including but not limited to sand . . . Likewise, T&T provided drivers to Schlumberger to

operate Schlumberger vehicles . . . ."; Ex. 1, Answer to Interrog. No. 4 ("Each of the

Plaintiffs were employed as drivers by T&T and assigned to drive Schlumberger trucks,

hauling sand . . . ."); Ex. 1, Answer to Interrog No. 6 ("Plaintiffs delivered . . . sand to

various well sites . . . .").

While recruiting Plaintiffs to sign on as SLB Drivers, T&T consistently said that

SLB Drivers would be driving only in Arkansas servicing the BHP wells.  <u>See</u> Alexander

Dep. 25:13–26:6, 53:16–54:13; Grimes Dep. 32:16–33:4, 33:20–34:1; Collum Dep.

22:6–24:3; Pritchard Dep. 31:9–32:6, 66:10–16, 108:1–20; McNeal Dep. 28:7–29:16,

30:3–23; Davis Dep. 70:1–72:6; Utley Dep. 37:8–38:12; Houpt Dep. 77:20–78:18;

Phillips Dep. 26:9–28:11; Schroeder Dep. 75:11–76:24; Howland Dep. 45:2–46:1.

Additionally, T&T told Plaintiffs that, as SLB Drivers, they would work five days per week

**Page 17 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

and twelve hours per day, would be paid $1,400.00 per week,[3] and would be home every night.  See id.

Consistent with T&T's recruiting talking points, SLB Drivers primarily hauled frack sand in Arkansas for approximately a year and a half, from January of 2012 through mid-July of 2013.   See generally, Exs. 4, 6, 8, 10, 13, 15, 17, 20, 22 (showing Schlumberger's E-Journey Reports); see also, Ex. 27 (showing each Plaintiff's dates in SLB trucks and number of out of state logs).

The few occasions when SLB Drivers drove across state lines during this period of time were for extraordinary purposes, outside of their normal, primary sand-hauling duties.  For example, some Plaintiffs drove outside of Arkansas for the purpose of truck inspections and equipment relocations, including the two times that some Plaintiffs rode to Louisiana to bring the SLB fleet to Arkansas.  See, e.g., Alexander Dep. 80:2–8 (for truck inspection); Grimes Dep. 27:22–28:8 (picking up SLB trucks from Louisiana to Arkansas); Collum Dep. 46:10–47:1 (equipment move).[4]

In mid-July of 2013, the SLB trucks and some Plaintiffs, those who were still working as SLB Drivers, temporarily went to Oklahoma and Texas for approximately one month before returning to Arkansas.  See, e.g., Houpt Dep. 101:14–16 (noting that the Oklahoma stint lasted "around a month").  Prior to the temporary stint in Oklahoma and Texas, T&T stated that it would last only a week or two.  See Houpt Dep. 80:18–81:9. After this, the SLB Drivers resumed driving in Arkansas, see, e.g., Ex. 17, but then, in

---

[3]     T&T Drivers, on the other hand, earned a commission, which was calculated as 25% of the value of the load that the driver hauled.  T&T Answ. ¶ 65; cf. Alexander Dep. 18:12–18.

[4]     There are a few others, but these are cited for illustrative purposes.

**Page 18 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

October of 2010, Schlumberger permanently relocated the trucks to Oklahoma, <u>see</u> Smith Decl. ¶ 35, ECF No. 8-2, (explaining that around October of 2013, "Schlumberger chose to reassign their twelve (12) trucks to . . . Oklahoma . . . ."). When these trucks were reassigned to Oklahoma, Plaintiffs who were still working as SLB Drivers either quit or returned to driving as T&T Drivers, which subjected them again to being called upon to drive out of state as an ordinary part of their job duties. <u>See, e.g.</u>, Houpt Dep. 107:5–12 (stating that he quit because T&T told him he would have to start driving to Texas and New Mexico); Phillips Dep. 92:1–93:25 (stating that he quit because he was going to be sent to North Dakota); Alexander Dep. 74:6–23 (sent to Hobbs, New Mexico as a T&T Driver); Schroeder Dep. 35:13–20 (affirming that he was driving in other states after getting out of SLB trucks).

**Page 19 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

# VI.      STANDARD OF REVIEW

The summary judgment standard is as follows:

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must support its contention by pointing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to demonstrate that no genuine issue of material fact exists. Rule 56(c)(1)(A). The evidence must be "viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (citing Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

The initial burden falls on the movant to "inform[] the district court of the basis for its motion and identify[] those portions of the record which show a lack of genuine issue." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992). However, it is the nonmovant's burden to "produce sufficient evidence to support a verdict in his favor based on more than speculation, conjecture, or fantasy." Doe v. Dep't of Veterans Affairs of the U.S., 519 F.3d 456, 460 (8th Cir. 2008) (internal quotation omitted). "A party cannot defeat a summary judgment motion by asserting 'the mere existence of some alleged factual dispute between the parties'; the party must assert that there is a 'genuine issue of material fact.'" Quinn v. St. Louis County, 653 F.3d 745, 751 (8th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The fact must be material so that it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. The grant of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." In re Baycol Prods. Litig., 596 F.3d 884, 888-89 (8th Cir. 2010) (quoting Celotex Corp., 477 U.S. at 322). "In sum, the evidence must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" Reed v. City of St. Charles, Mo., 561 F.3d 788, 791 (8th Cir. 2009) (quoting Liberty Lobby, 477 U.S. at 248).

Ely v. Dolgencorp, LLC, 827 F. Supp. 2d 872, 879–80 (E.D. Ark. 2011).

**Page 20 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

## VII.     ELEMENTS OF AND DEFENSES TO LIABILITY

The FLSA and AMWA require covered employers to pay covered employees one and one-half times their regular rate for all hours worked over forty per week, unless a valid exemption applies to the employees.   See 29 U.S.C.S. § 207 (LEXIS 2015) (requiring overtime pay for hours over forty); 29 U.S.C.S. § 213 (LEXIS 2015) (listing various exemptions to the overtime requirements of the FLSA); Ark. Code Ann. § 11-4-211 (LEXIS 2015) (stating general overtime rule and listing exemptions).

To succeed on a claim for an FLSA violation, a plaintiff has the burden to prove the following elements: **(1)** the existence of an **employer-employee relationship** with the defendant, see 29 U.S.C.S. § 207(a) (requiring payment of overtime by "employers" to "employees"); **(2) coverage** under the interstate commerce requirements of the FLSA, see id. (requiring payment of overtime to employees "engaged in commerce or in the production of goods for commerce, or employed in an enterprise engaged in commerce"), **(3)** employee's performance of **work over forty hours per week**, see id. (prohibiting employers from working employees for more than forty hours per week unless it pay one and one-half times the employee's regular rate for all hours worked over forty in the week) and **(4)** employer's **failure to pay an overtime premium**, see id; see also, Morgan v. Family Dollar Stores, 551 F.3d 1233, 1277 n.68 (11th Cir. 2008) (stating the four elements of a *prima facie* wage claim under the FLSA).

These same elements apply to AMWA claims, except that the "coverage" element requires only proof that the employer employed four or more employees during each

**Page 21 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

relevant work week.  See Ark. Code Ann. §§ 11-4-211 (stating overtime requirements), 11-4-203(4)(B) (defining "employer") (LEXIS 2015).

This Section is dedicated to showing that Separate Defendant Tutle and Tutle Trucking, Inc. ("T&T"), is liable to Plaintiffs for any overtime that they worked. Specifically, Plaintiffs seek summary judgment that the first two elements of a wage claim are satisfied and that the MCA Exemption does not apply to Plaintiffs in this case. Section A, infra., explains that an employer-employee relationship existed between Plaintiffs and Separate Defendant T&T during the relevant time.   Section B, infra, explains that the employer-employee relationship between Plaintiffs and Separate Defendant T&T satisfied the "coverage" requirement of the FLSA during the relevant time.  Section C, infra, explains how the MCA Exemption does not apply to Plaintiffs in this case under well recognized and defined legal standards.[5]  Section D, infra, defines, and asks this Court to, recognize and apply a public policy exception to the MCA Exemption to certain Plaintiffs in this case.

## A.    An Employer-Employee Relationship Existed Between Plaintiffs and Separate Defendant Tutle and Tutle Trucking, Inc., During the Relevant Time.

An employer-employee relationship existed between Plaintiffs and Separate Defendant T&T during the relevant time.  The FLSA and AMWA define an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C.S. § 203(d) (LEXIS 2015); see also, Ark. Code Ann. § 11-4-

---

[5]     Plaintiffs do not seek summary judgment on the damages elements of their FLSA or AMWA claims, that is, elements three and four listed in the preceding paragraph.

**Page 22 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

203(4)(A) (LEXIS 2015).  An employee is defined as "an individual employed by an employer."  29 U.S.C.S. § 203(e) (LEXIS 2015); <u>see also</u>, Ark. Code Ann. § 11-4-203(3).  An individual is employed by an employer when the employer suffers or permits the employee to work on the employer's behalf.  <u>See</u> 29 U.S.C. § 203(e); <u>see also</u>, Ark. Code Ann. § 11-4-203(2).

Here, T&T directly admits that it employed Plaintiffs.  <u>See</u> T&T Answ. ¶¶ 10–22.  T&T designated and permitted each Plaintiff to work as an SLB Driver for a period of time.  <u>See</u> T&T Answ. ¶¶ 12–22, 63.  T&T paid Plaintiffs wages for their work.  <u>See</u> Smith Decl. ¶ 32.  T&T suffered or permitted Plaintiffs, as SLB Drivers, to drive to sand storage facilities, load sand onto their trailers, haul the sand to wells, wait for the sand coordinator to direct them to off-load the sand, and assist in the off-loading of the sand at the well site.  <u>See</u> Alexander Dep. 18:2–4, 21:22–24, 27:5–9, 29:10–15, 30:7–10, 31:2–23, 39:6–10, 43:7–17, 47:25–48:2; Grimes Dep. 22:17–19, 34:9–35:1, 39:8–40:20, 52:4–17; Collum Dep. 17:21–23, 27:1–28:4, 32:7–9, 53:10–54:8; Pritchard Dep. 21:2–5, 30:3–10, 54:18–55:5, 57:14–17, 64:18–65:4 ("We just kept the sand to the frac and we kept it going. . . . That was my job with my truck and everybody rode together and went to the well with the sand, delivery."), 70:2–13, 77:17–23, 78:1–8; McNeil Dep. 33:12–18, 74:12–18; Davis Dep. 18:2–20, 41:15–42:7, Utley Dep. 39:23–25, 42:2–7, 51:23–52:2, 54:15–56:13, 107:4–6; Houpt Dep. 31:25–32:15; Phillips Dep. 30:14–31:10 (explaining that, after he would tell dispatch that he was over his legal limit of hours, dispatch would say, "The well is going to run out of sand . . . we got to have somebody."); 33:13–34:6 (explaining sand delivery process), 37:5–17 (would work in the shop, not hauling sand,

**Page 23 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

only three to four days per month) 84:3–7; Schroeder Dep. 52:6–53:22 (describing waiting time, "demerge time," and role of SLB Drivers as "demerge busters"), 88:3–93:8 (describing overall process of loading, driving, and unloading sand); 97:2–4 (spent only two days moving equipment); Howland Dep. 49:15–21, 53:25–53:4, 59:6–65:13, 67:4–10, 83:25–84:21 (only two or three equipment moves), 92:25–93:3, 100:6–22; T&T Answ. ¶ 62; Ex. 1, Answer to Interrog. No. 3 ("T&T is an interstate trucking company. T&T trucks provide transportation of product, including but not limited to sand . . . Likewise, T&T provided drivers to Schlumberger to operate Schlumberger vehicles . . . ."; Ex. 1, Answer to Interrog. No. 4 ("Each of the Plaintiffs were employed as drivers by T&T and assigned to drive Schlumberger trucks, hauling sand . . . ."); Ex. 1, Answer to Interrog No. 6 ("Plaintiffs delivered . . . sand to various well sites . . . .").

For these reasons, Plaintiffs and T&T indisputably had an employer-employee relationship, and therefore, Plaintiffs are entitled to summary judgment on this issue.

**B.   The Employer-Employee Relationship Between Plaintiffs and Separate Defendant Tutle and Tutle Trucking, Inc., Satisfied the "Coverage" Requirement of the Fair Labor Standards Act and the Arkansas Minimum Wage Act During the Relevant Time.**

The employer-employee relationship between Plaintiffs and Separate Defendant Tutle and Tutle, Trucking, Inc. satisfied the "coverage" requirement of the FLSA and the AMWA during the relevant time.   A plaintiff may use one of two methods to prove "coverage" under the interstate commerce requirements of the FLSA.   One method is through proof of individual coverage.   See 29 U.S.C.S. § 207 (referring to employees who . . . are engaged in commerce or in the production of goods for commerce).   The other method is through proof of enterprise coverage.   See id. (referring to employees

**Page 24 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

who are employed in an *enterprise* engaged in commerce).  In order to prove enterprise coverage, a plaintiff must show that (1) its employer has at least two or more employees engaged in commerce, even if it's not the plaintiff, and (2) has an annual gross volume of sales of $500,000.00 or more.  See 29 U.S.C.S. § 203(s)(1) (LEXIS 2015).

Further, "commerce" under the FLSA encompasses a broad range of activities. Starting with the statutory definition, "[c]ommerce means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."  29 U.S.C.S. § 203(b) (LEXIS 2015).  Further, the definition of commerce should be given "a liberal construction and the question whether an employee is engaged in commerce within the meaning of the [FLSA] is determined by practical considerations, not technical conceptions." Mitchell v. Kroger Co., 248 F.2d 935, 938 (8th Cir. 1957); see also, Specht v. City of Sioux Falls, 639 F.3d 814, 819-820 (8th Cir. 2011) (quoting Benshoff v. City of Va. Beach, 180 F.3d 136, 140 (4th Cir. 1999) (noting that courts are encouraged to "broadly interpret and apply the FLSA to effectuate its . . . remedial and humanitarian . . . purpose.").  Employees' handling of supplies or equipment that originated out-of-state is sufficient to invoke enterprise coverage.  Locke v. St. Augustine's Episcopal Church, 690 F. Supp. 2d 77, 88 (E.D.N.Y. 2010).  Courts have held that employees' handling of janitorial goods and cleaning products that have moved in commerce is more than sufficient to invoke enterprise coverage.  See generally, Boekemeier v. Fourth Universalist Soc'y, 86 F. Supp. 2d 280 (S.D.N.Y. 2000); Archie v. Gran Cent. Partnership, Inc., 997 F.Supp. 504, 530 (S.D.N.Y. 1998).

**Page 25 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Under the AMWA, an employer meets the coverage requirement if it employs four or more employees during the relevant work weeks.  See Ark. Code Ann. § 11-4-203(4)(B).

In this case, T&T indisputably meets the elements of enterprise coverage under the FLSA.  First, T&T's annual gross volume of sales made or business done was not less than $500,000.00 (exclusive of excise taxes at the retail level that are separately stated) during each of the three calendar years preceding the filing of the Original Complaint in this case.  Tutle Answ. ¶ 27.  Further, T&T employed at least two or more employees handling fracking sand and other commodities that had been moved in interstate commerce.  See Ex. 1, Answer to Interrog. No. 3 ("T&T is an interstate trucking company.  T&T trucks provide transportation of product, including but not limited to sand . . . ."); see also, Smith Decl. ¶¶ 3–8, ECF No. 10-2 (explaining that T&T has been transporting these types of commodities in and out of the State of Arkansas since 2009) ¶ 19 (stating that T&T employs approximately 520 drivers).

Further, T&T indisputably meets the coverage requirement of the AMWA.  Smith Decl. ¶¶ 3–8, ECF No. 10-2 (explaining that T&T has been transporting these types of commodities in and out of the State of Arkansas since 2009) ¶ 19 (stating that T&T employs approximately 520 drivers).

Therefore, T&T is a covered employer under both the FLSA and the AMWA, and Plaintiffs are entitled to summary judgment on this issue.

**Page 26 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

**C.     The Motor Carrier Act Exemption to the Overtime Requirements of the Fair Labor Standards Act and the Arkansas Minimum Wage Act Does Not Apply to Plaintiffs for at Least Some of the Time in Which Plaintiffs Were Designated as Schlumberger Drivers.**

The Motor Carrier Act Exemption ("MCA Exemption") to the overtime requirements of the FLSA and AMWA does not apply to Plaintiffs for at least some of the time in which Plaintiffs were designated as SLB Drivers.  Section 1 below sets forth the legal premise that the MCA Exemption does not apply to drivers who are not expected to regularly drive in interstate commerce in the ordinary course of their duties or whose participation in interstate commerce is *de minimis*.  Sections 2 and 3 below delineate two separate periods of time in which Plaintiffs were ***not*** expected to regularly drive in interstate commerce in the ordinary course of their duties and in which Plaintiffs' participation in interstate commerce was *de minimis.*

1.     The Motor Carrier Act exemption does ***not*** apply to drivers who are not expected to regularly drive in interstate commerce in the ordinary course of their duties or whose participation in interstate commerce is *de minimis.*

The MCA Exemption does ***not*** apply to drivers who are not expected to regularly drive in interstate commerce in the ordinary course of their duties or whose participation in interstate commerce is *de minimis*.  Section a. below discusses, generally, how the overtime requirements under the FLSA may be overcome by the MCA Exemption and the standards for applying the MCA Exemption.   Section b. below discusses more specifically what a defendant must prove to meet the interstate commerce requirements of the MCA Exemption.

**Page 27 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

      a.    *An employee who works in excess of 40 hours per week is entitled to be paid time and a half for all hours over 40, unless the employee is subject to the MCA Exemption.*

An employee who works in excess of 40 hours per week is entitled to be paid time and a half for all hours over 40, unless the employee is subject to the MCA Exemption.  "Generally, under the Fair Labor Standards Act (FLSA), an employee who works in excess of 40 hours per week is entitled to be paid one-and-a-half times his or her regular pay rate for the excess hours."  McCall v. DAV, 723 F.3d 962, 964 (8th Cir. 2013); see also, Ark. Code Ann. § 11-4-211 (requiring payment of overtime).  However, the MCA Exemption exempts from FLSA and AMWA overtime requirements "any employee with respect to whom the Secretary of Transportation has power to establish . . . maximum hours of service."  29 U.S.C.S. § 213(b)(1) (LEXIS 2015); McCall, 723 F.3d at 964.; Ark. Code Ann. § 11-4-211(d) (incorporating the MCA Exemption into the AMWA).[6]  "The exemption serves to prevent conflict between the FLSA and the Motor Carrier Act of 1935 . . . ."  D'Arpa v. Runway Towing Corp., No. 12-CV-1120, 2013 U.S. Dist. LEXIS 85697 at *20–22 (E.D.N.Y. June 18, 2013).  The Eastern District of New York succinctly explains:

> [Congress] gave the Interstate Commerce Commission ("ICC") — and later, the DOT — the authority to regulate the maximum hours of work for employees of "common carriers" and "contract carriers" by motor vehicle. Thus, [s]o that the overtime provisions of the FLSA and the MCA do not overlap or interfere with each other, those employees whose working hours are regulated by the DOT are exempt from the FLSA's [overtime] requirements.

---

[6]    The MCA Exemption is incorporated by reference into the AMWA, and therefore, for purposes of this brief and this Court's analysis, the MCA Exemption under the AMWA is treated the same as the MCA Exemption under the FLSA.

**Page 28 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Id. (some internal quotations omitted).

Although the MCA Exemption requires a multi-step review of a series of otherwise seemingly unrelated statutes, see Op. and Order at 4, Phillips v. Oil Patch Water & Sewer Servs., LLC, No. 4:11-cv-776-JLH (E.D. Ark. Aug. 1, 2012), filed in this case at ECF No. 10-2, the United States Department of Labor ("DOL") has promulgated a regulation that clarifies the two substantive elements required for the MCA Exemption to apply, see 29 C.F.R. § 782.2 (LEXIS 2015).

The MCA Exemption extends to only those classes of employees who: [1] [a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under Section 204 of the Motor Carrier Act, and [2] engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.  29 C.F.R. § 782.2(a) (LEXIS 2015) (internal citations omitted).  Thus, "[w]hether the motor carrier exemption applies to an employee depends on the nature of both the employer's and employees' activities."  Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266, 273 (S.D.N.Y. 2008) (citing 29 C.F.R. § 782.2(a)); cf., Goldberg v. Faber Industries, Inc., 291 F.2d 232, 235 (7th Cir. 1962) ("The District Court was in error in holding the employer's operations were controlling.   The test is the nature of the transportation performed by the employees."); accord, Cerutti v. Frito Lay, Inc., 777 F. Supp. 2d 920, 940 (W.D. Pa. 2011) ("This court finds persuasive the rationale of the majority of other district courts . . . and concludes that under SAFETEA-LU an employee's activities are considered in

**Page 29 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

determining whether or not he or she is subject to the authority of the Secretary of Transportation . . . .").

First, "[t]he employer must be within the jurisdiction of the Secretary of Transportation by virtue of operating as a 'motor carrier' or 'motor private carrier,' as defined by the statute." Dauphin, 544 F. Supp. 2d at 273. "A motor carrier is 'a person providing commercial motor vehicle . . . transportation for compensation.'" Id. In turn, a commercial motor vehicle means a vehicle that is used to transport passengers or property in interstate commerce and either (a) weighs more than 10,000 pounds or (b) is designed to transport eight or more passengers. Id.

Further, the DOL states that the MCA Exemption applies only if the employee is a driver, helper, loader, or mechanic directly affecting the safety of a vehicle that operates in interstate commerce:

> The exemption is applicable, under decisions of the U.S. Supreme Court, to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper, loader, or mechanic, and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2(b)(2) (LEXIS 2015) (citing Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695 (1947); Levinson v. Spector Motor Service, 330 U.S. 649 (1947); Morris v. McComb, 332 U.S. 4[2]2 (1947)).

Generally speaking, "the Supreme Court . . . has made it clear that the determination whether or not an individual employee is within [the MCA Exemption] is to be determined by judicial process." 29 C.F.R. § 782.2(b)(2). Also, *the MCA Exemption*

**Page 30 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

***is construed narrowly against the employer, and the employer bears the burden of showing that the employee falls within it***. Beauford v. ActionLink, LLC, No. 13-3265, No. 13-3380, 2015 U.S. App. LEXIS 4539 at *10 (8th Cir. Mar. 20, 2015); Masson v. Ecolab, Inc., No. 04 Civ. 4488 (MBM), 2005 U.S. Dist. LEXIS 18022 at *17 (S.D.N.Y. Aug. 17, 2005) ("The motor carrier exemption, like all exemptions to the FLSA, is 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'"). "The motor carrier exemption applies to employees over whom the Secretary of Transportation has jurisdiction regardless of whether the Secretary has actually exercised that authority." D'Arpa, 2013 U.S. Dist. LEXIS 85697 at *22.  However, "[i]n determining whether an employee falls within such an exempt category, neither the name given to his position nor that given to the work that he does is controlling; what is controlling is the character of the activities involved in the performance of his job."  29 C.F.R. § 782.2(b)(2) (internal citations omitted).

Finally, a company may meet the general FLSA standard of activity in interstate commerce for purposes of *prima facie* liability, while failing to prove the interstate commerce requirements of the MCA Exemption as to a particular driver.  29 C.F.R. § 782.7(a) (LEXIS 2015).   In other words, just because a trucking company is an enterprise engaged in interstate commerce for purposes of FLSA liability does not necessarily mean that all drivers in the company are subject to the MCA Exemption.[7]

---

[7]        "What constitutes such transportation in interstate or foreign commerce, sufficient to bring such an employee within the regulatory power of the Secretary of Transportation under section 204 of that

**Page 31 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

act, is determined by definitions contained in the Motor Carrier Act itself. These definitions are, however, not identical with the definitions in the Fair Labor Standards Act which determine whether an employee is within the general coverage of the wage and hours provisions as an employee 'engaged in (interstate or foreign) commerce.' For this reason, **the interstate commerce requirements of the section 13(b)(1) exemption are not necessarily met by establishing that an employee is 'engaged in commerce' within the meaning of the Fair Labor Standards Act** when performing activities as a driver, driver's helper, loader, or mechanic, where these activities are sufficient in other respects to bring him within the exemption." 29 C.F.R. § 782.7(a).

"The wage and hours provisions of the Fair Labor Standards Act are applicable not only to employees engaged in commerce, as defined in the act, but also to employees engaged in the production of goods for commerce. Employees engaged in the 'production' of goods are defined by the act as including those engaged in 'handling, transporting, or in any other manner working on such goods, or in closely related process or occupation directly essential to the production thereof, in any State.' (Fair Labor Standards Act, sec. 3(j), 29 U.S.C., sec. 203(j), as amended by the Fair Labor Standards Amendments of 1949, 63 Stat. 910. See also the Division's Interpretative Bulletin, part 776 of this chapter on general coverage of the wage and hours provisions of the act.). **Where transportation of persons or property by motor vehicle between places within a State falls within this definition, and is not transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act because movement from points out of the State has ended or because movement to points out of the State has not yet begun, the employees engaged in connection with such transportation (this applies to employees of common, contract, and private carriers) are covered by the wage and hours provisions of the Fair Labor Standards Act and are not subject to the jurisdiction of the Secretary of Transportation.** Examples are: (1) Drivers transporting goods in and about a plant producing goods for commerce; (2) chauffeurs or drivers of company cars or buses transporting officers or employees from place to place in the course of their employment in an establishment which produces goods for commerce; (3) drivers who transport goods from a producer's plant to the plant of a processor, who, in turn, sells goods in interstate commerce, the first producer's goods being a part or ingredient of the second producer's goods; (4) drivers transporting goods between a factory and the plant of an independent contractor who performs operations on the goods, after which they are returned to the factory which further processes the goods for commerce; and (5) drivers transporting goods such as machinery or tools and dies, for example, to be used or consumed in the production of other goods for commerce. **These and other employees engaged in connection with the transportation within a State of persons or property by motor vehicle who are subject to the Fair Labor Standards Act because engaged in the production of goods for commerce and who are not subject to the Motor Carrier Act because not engaged in interstate or foreign commerce within the meaning of that act, are not within the exemption provided by section 13(b)(1).**" 29 C.F.R. § 787.7(c) (LEXIS 2015) (emphasis added).

"The Interstate Commerce Commission held that transportation confined to points in a single State from a storage terminal of commodities which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State is not in interstate or foreign commerce within the meaning of part II of the Interstate Commerce Act if the shipper has no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment." 29 C.F.R. § 782.7(b)(2) (LEXIS 2015).

**Page 32 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

       b.    *The interstate nature of an employee's job must be an expected or regular part of the job, and not de minimis.*

As to the requirement under the MCA Exemption that an employee's duties involve transportation of property *in interstate commerce*, the interstate nature of the employee's job must be an expected or regular part of the job, and not *de minimis*.  As stated by the relevant regulations and cases, drivers must be "***likely*** to be[] called upon in the ***ordinary*** course of [their] work to perform, either regularly or from time to time," interstate safety-affecting activities.  29 C.F.R. § 782.2(b)(3) (LEXIS 2015); <u>see also</u>, <u>Morris v. McComb</u>, 332 U.S. 422, 433 (1947) (holding drivers exempt where, *inter alia*, their interstate trips were "a natural, integral and apparently inseparable part of the common carrier service of the [employer] and of his drivers"); <u>Masson</u>, 2005 U.S. Dist. LEXIS 18022 at *24 ("Driving in interstate commerce alone does not trigger the motor carrier exemption. ***Such driving, however frequent, must have been an expected and regular part of an employee's job duties***." (emphasis added)).

Put another way, jurisdiction does not even attach, "if the possibility of interstate driving is remote." Op. and Order at 4, <u>Phillips</u>, No. 4:11CV00776-JLH, <u>filed in this case as</u> ECF No. 10-2 (citing Application of the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37,902, 37,903 (July 23, 1981).

Accordingly, where the relationship between a driver's normal or regular job duties and interstate commerce is *de minimis*, then the MCA Exemption applies only in those work weeks where the employee actually drives across state lines.  <u>See</u> 29 C.F.R. § 782.2(b)(3).  This principle is stated precisely by the DOL:

**Page 33 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

> [W]here the continuing duties of the employee's job have **no substantial direct effect** on such safety of operation or **where such safety-affecting activities[8] are so trivial, casual, and insignificant as to be de minimis**,

---

[8]    Careful review of the entire regulation shows that the words, "such safety-affecting activities" used here is a short-hand phrase that includes involvement in interstate commerce.   In discussing employees who are covered by the MCA Exemption, § 782.2(b)(3) refers to "*safety-affecting activities* of the character described in paragraph (b)(2) of this section."   See § 782.2(b)(3) (emphasis added).  The safety activities described in paragraph (b)(2) are activities "directly affecting the safety of operation of motor vehicles on the public highways in transportation *in interstate or foreign commerce* within the meaning of the Motor Carrier Act."   See 29 C.F.R. § 782.2(b)(2) (emphasis added).  Thus, when sub-section (b)(3) states that *de minimis* safety-affecting activities do **not** bring an employee within the Motor Carrier Act exemption, it refers both to the effect the duties have on safety **and** interstate commerce.

The Southern District of Texas has incorrectly suggested that the frequency of interstate travel is not a factor to consider because the *de minimis* doctrine, as stated in § 782.2(b)(3), does not apply to the effect with which an employee engages in interstate commerce, but applies only to an employee who switches between job duties that affect safety and job duties that do not.   See Allen v. Coil Tubing Servs., L.L.C., No. H-08-3370, 2012 U.S. Dist. LEXIS 2573 at *14 (S.D. Tex. Jan. 10, 2012) ("The [§ 782.2(b)(3)] exception provides that the MCA Exemption does not apply where the continuing duties *of the employee's job* have no substantial effect on safety or where those activities are trivial, casual, and insignificant."); but see, e.g.,  Velez v. New Haven Bus Serv., No. 3:13cv19 (JBA), 2015 U.S. Dist. LEXIS 1275 at *22 (D. Conn. Jan. 6, 2015) (noting that the "proportion of interstate-to-intrastate employee activity" is a factor to consider in determining the character of the employee's job).

This narrow view fails to give due consideration to the interstate commerce requirement of the MCA Exemption, the specific references to the interstate commerce requirement contained in § 782.2(b)(3), and proper rules of statutory construction.   See § 782.2(b)(2) (limiting MCA Exemption to drivers who perform safety affecting duties *in interstate commerce*); § 782.2(b)(3) (specifically referring to the interstate commerce requirement).  Not only is the interstate commerce requirement of the MCA Exemption grammatically inseparable from the safety-affecting-duties requirement, see § 782.2(b)(2), it is also legally inseparable because it is the very basis of the federal government's power to regulate the hours of drivers, see United States v. Lopez, 514 U.S. 549, 552, 566 (1995) (explaining that Congress's legislative power is limited to those enumerated in the Constitution and is not a general police power); U.S. Const. art. I, § 8 (granting Congress the power to regulate interstate commerce).  Additionally, the § 782.2(b)(3) *de minimis* exception specifically includes the "interstate commerce" requirement within its scope when it says: "***This general rule assumes*** that the activities involved in the continuing duties of the job in all such workweeks will include activities which have been determined to affect directly the safety of operation of motor vehicles on the public highways *in transportation in interstate commerce*.  § 782.2(b)(3) (emphasis added).  Further, § 782.2(b)(4) describes the particular situation that the Allen Court ascribes to § 782.2(b)(3).  In § 782.2(b)(4), the regulation specifically applies "[w]here the same employee of a carrier is shifted from one job to another periodically or on occasion."  Thus, if § 782.2(b)(3) were intended to be limited to situations where employees transfer from non-safety affecting jobs to safety-affecting jobs, then § 782.2(b)(4) would be superfluous.

Thus, as several other courts have determined, the *de minimis* doctrine applies to the interstate commerce requirement of the MCA Exemption, in addition to the safety-affecting-duties-requirement.  See generally, Flowers v. Regency Transp., Inc., 535 F. Supp. 2d 765 (S.D. Miss. 2008) (denying summary judgment to employer where the employee drivers' connection to interstate commerce was no more than *de minimis*) ("While plainly, there is no requirement that an employer's interstate business be substantial

**Page 34 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

**the exemption will not apply to him in any workweek so long as there is no change in his duties**. . . . If in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, **the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job**.

29 C.F.R. § 782.2(b)(3) (emphasis added) (citations omitted); see also, Dauphin, 544 F. Supp. 2d at 274; Masson, 2005 U.S. Dist. LEXIS 18022 at *18–19.  Although the next subsection describes employees whose job duties change from non-safety affecting to safety-affecting, this same *de minimis* principle is stated again:

> *Where the same employee of a carrier is shifted from one job to another periodically or on occasion*, the application of the exemption to him in a particular workweek is tested by application of the above principles to the job or jobs in which he is employed in that workweek. Similarly, in the case of *an employee of a private carrier whose job does not require him to engage regularly in exempt safety-affecting activities* described in paragraph (b)(1) of this section *and whose engagement in such activities occurs sporadically or occasionally* as the result of his work assignments at a particular time, *the exemption will apply to him only in those workweeks when he engages in such activities*.

29 C.F.R. § 787.2(b)(4) (LEXIS 2015) (emphasis added).

To be sure, neither an employer nor a driver need engage in a "substantial" volume of interstate activity for the MCA Exemption to apply, as long as (1) the interstate services rendered by the employer are "distributed generally throughout the year," (2) "the performance of [those interstate] services [are] shared indiscriminately"

---

or that its employees engage in a substantial volume of interstate activity in order that the employees come under the jurisdiction of the Secretary of Transportation, the connection by both with interstate commerce must be more than de minimis [sic]."  Id. at 769.); see also, Coleman v. Jiffy June Farms, Inc., 324 F. Supp. 664, 669 (S.D. Ala. 1970) (finding as immaterial the employer's distinction between prior cases involving employees who were occasionally reassigned from non-safety-affecting to safety-affecting duties and the plaintiff drivers who rarely drove across state lines).

**Page 35 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

by the drivers, and (3) the interstate trips are "a natural, integral, and . . . inseparable part of the common carrier service of the employer and the drivers" such that the drivers are "likely to be[] called upon in the ordinary course of [their] work to perform" interstate safety-affecting activities.  See Morris v. McComb, 332 U.S. 422, 433 (1947) (holding drivers exempt where "interstate commerce trips were distributed generally throughout the year," the interstate trips were "shared indiscriminately by the drivers," and the trips were "a natural, integral and apparently inseparable part of the common carrier service of the [employer] and of his drivers"); Velez v. New Haven Bus Serv., No. 3:13cv19 (JBA), 2015 U.S. Dist. LEXIS 1275 at * 21–22 (D. Conn. Jan. 6, 2015) ("An employer seeking application of the [MCA] exemption must prove . . . that interstate travel constitutes a natural, integral and . . . inseparable part of the employees duties, such that any employee is likely to be called on to perform interstate travel." (internal quotation marks omitted)); Masson, 2005 U.S. Dist. LEXIS 18022 at *24 ("Driving in interstate commerce alone does not trigger the motor carrier exemption. ***Such driving, however frequent, must have been an expected and regular part of an employee's job duties***." (emphasis added)); 29 C.F.R. § 782.2(b)(3) ("As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is (or in the case of a member of a group of drivers . . . is ***likely to be) called upon in the ordinary course of his work*** to perform, either regularly or from time to time, safety-affecting activities . . . he comes within the exemption in all workweeks when he is employed at such job." (emphasis added)).

**Page 36 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

In Morris, the employer's interstate activity constituted only four percent (4%) of its total carrier services.  See id. at 423, 432–33.  Yet, the employer distributed these interstate trips to all forty-three (43) of its drivers generally throughout the year and indiscriminately assigned these interstate trips to all its drivers.  See id.  One or more drivers made an interstate trip each week.  See id. at 433.  The average number of total drivers making interstate trips per week was nine (9) drivers out of thirty-seven (37), or 24.4%, while the highest number of drivers per week was twenty-five (25) drivers out of the thirty-two (32) who were on duty during that week, or 78.1%.  Id.  Also, the average number of interstate trips made per driver during the relevant time was sixteen (16), with one driver making ninety-seven (97) interstate trips and another making fifty-two (52).  Id.; cf. Yellow Transit Freight Lines, Inc. v. Balven, 320 F.2d 495 (8th Cir. 1963).[9]

Further, while the volume of interstate activity need not be "*substantial*" for the MCA Exemption to apply, both the employer's and the driver's connections "with

---

[9]  Balven's applicability to this case is limited.  Balven stands for the proposition that, to fall within the MCA Exemption, the amount of time spent in interstate commerce need not be "substantial."  See Balven, 320 F.2d at 498 (The factual question to be decided is not whether a substantial part of Balven's duties affected the safety of operation . . . .").  However, this does not negate the requirement that the driver's connections to interstate commerce be "a natural, integral, and . . . inseparable part of the common carrier service of the employer and the drivers," see Morris, 332 U.S. at 433, such that the drivers are "likely to be[] called upon in the ordinary course of [their] work to perform" interstate safety-affecting activities, see 29 C.F.R. § 782.2(b)(3); see also Masson, 2005 U.S. Dist. LEXIS 18022 at *24 (noting that interstate driving "must have been an expected and regular part of an employee's job duties").  Further, the lack of a requirement that time spent in interstate activity rise to the level of substantial does not foreclose the requirement that the connection between the employee's duties and interstate activity be more than *de minimis.*  See Flowers, 535 F. Supp. 2d at 769 ("While plainly, there is no requirement that an employer's . . . employees engage in a substantial volume of interstate activity in order that the employees come under the jurisdiction of the Secretary of Transportation, the connection by both with interstate commerce must be more than de minimis.").  Balven also does not more recent decisions where courts find that the time spent in performing interstate driving is indicative of whether interstate driving was part of the employee's expected and regular job duties.  See, e.g., Dole v. Circle "A" Constr., Inc., 738 F. Supp. 1313, 1321 (D. Idaho 1990) (noting the courts consider the proportion of intrastate to interstate trips).

Page 37 of 72
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

interstate commerce must be more than de minimis [sic]." Flowers v. Regency Transp., Inc., 535 F. Supp. 2d 765, 769 (S.D. Miss. 2008);  see also, Reich v. American Driver Serv., 33 F.3d 1153, 1155–56 (9th Cir. 1994) ("an employee's minor involvement in interstate commerce does not necessarily subject that employee to the Secretary of Transportation's jurisdiction . . . and if the employee's minor involvement can be characterized as de minimis, that employee may not be subject to the Secretary of Transportation's jurisdiction at all" [sic]); Friedrich v. U.S. Computer Services, 974 F.2d 409, 417 (3d Cir. 1992) ("The DOT has authority over drivers only where the employees regularly travel interstate or reasonably are expected to do interstate driving." (dicta); Wirtz v. C & P Shoe Corp., 336 F.2d 21, 29 (5th Cir. 1964) (affirming district court decision that MCA Exemption did not apply where warehousemen also drove trucks in interstate commerce, but only occasionally and sporadically); Seagram v. David's Towing & Recovery, Inc., No. 3:14-CV-414, 2014 U.S. Dist. LEXIS 148721 at *16–17 (E.D. Va. Oct. 17, 2014) (denying employer's motion to dismiss where there was a factual dispute over whether the employee's transport duties "involved sufficient interstate commerce or whether instead his involvement was only *de minimis*"); Barrios v. Suburban Disposal, Inc., No. 2:12-cv-03663 (WJM), 2013 U.S. Dist. LEXIS 175155 at *18–20 (D.N.J. Dec. 11, 2013) (denying summary judgment to employer where evidence suggested that the plaintiffs were assigned to semi-permanent, ***intrastate*** routes); Pritchett v. Werner Enters., No. 12-0182-WS-C, 2013 U.S. Dist. LEXIS 121430 at *26–27 (S.D. Ala. Aug. 27, 2013) (holding that, where "the amount of interstate travel (four short trips in over three years), the timing of the trips (confined to a single week),

**Page 38 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

the cause of the trips (a fluky plant shortage) and the distribution of the assignment (a single driver making ¾ of the trips," the plaintiff drivers were not "likely" to be called upon to drive interstate "from time to time"); Hoffman v. First Student, Inc., No. AMD 06-1882, 2009 U.S. Dist. LEXIS 53542 at *19–20 (D. Md. June 23, 2009) (denying summary judgment to employer where the plaintiffs worked "fewer than two interstate trips per year" during the relevant time); Dauphin, 544 F. Supp. 2d at 275 ("for the motor carrier exemption from the FLSA to apply, defendants here must establish either that the activities of the individual plaintiffs involved interstate travel of a character that was more than de minimis or that interstate travel was a 'natural, integral and . . . inseparable part' of the position plaintiffs held [sic]) (citing McComb, 332 U.S. at 433)); Masson, 2005 U.S. Dist. LEXIS 18022 at *23 ("where the employer's interstate activities affecting the safety of interstate motor operations are de minimis, the employer's exemption from FLSA requirements under the MCA consequently fades [sic]" (internal quote marks omitted)); Op. and Order at 4, Phillips, No. 4:11CV00776-JLH, filed in this case as ECF No. 10-2 (noting that jurisdiction by the DOT does not attach, and therefore, the MCA Exemption does not apply, "if the possibility of interstate driving is remote") (citing Application of the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37.902, 37.903 (July 23, 1981); Lieberman v. Corporate Connection Lines, Inc., No. 03-CIV-22814-HOEVELER, 2005 U.S. Dist. LEXIS 45222 at *5 (S.D. Fl. April 21, 2005) ("If the employer or employee's involvement in interstate commerce could be characterized as de minimus, they may not be subject to the Secretary of Transportation's jurisdiction at all, and thus are not covered by the Motor Carrier Act."

**Page 39 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

[sic]); <u>Dole v. Circle "A" Constr., Inc.</u>, 738 F. Supp. 1313, 1322 (D. Idaho 1990) ("a driver is not exempt under the Motor Carrier Act merely because he takes one or two interstate trips"); <u>Kimball v. Goodyear Tire & Rubber Co.</u>, 504 F. Supp. 544, 547–48 (E.D. Tex. 1980) (holding that MCA Exemption did not apply where only 0.17% trips were interstate, the interstate trips were not shared indiscriminately among all the drivers, and the interstate trips were made, on average, once every three weeks); <u>Coleman v. Jiffy June Farms, Inc.</u>, 324 F. Supp. 664, 668–71 (S.D. Ala. 1970), <u>aff'd regarding de minimis exception to MCA Exemption at</u>, 458 F.2d 1139 (5th Cir. 1971) ("the court does not feel constrained to allow [the MCA] exemption . . . on the basis of a minimum of evidence of interstate activity which is minimal in its scope and minimal in its nature").

Further, although courts focus on "the character of the activities rather than the proportion . . .," determining the "character" of interstate driving involves a fact-specific analysis. <u>Masson</u>, 2005 U.S. Dist. LEXIS 18022 at *24. Some factors for determining the "character" of a driver's duties include: (1) an examination of the method by which the employer assigns the interstate activity to the relevant pool of drivers, (2) the nature of the employer's business, (3) the proportion of interstate-to-intrastate trips, and (4) the reason or cause for the interstate trips. <u>See</u> <u>Velez</u>, 2015 U.S. Dist. LEXIS 1275 at *22 (listing the first three factors); <u>Dole</u>, 738 F. Supp. at 1321 (same); <u>Pritchett</u>, 2013 U.S. Dist. LEXIS 121430 at *26–27 (holding that the plaintiff drivers were not "likely" to be called upon to drive interstate "from time to time," where *inter alia*, "the cause of the trips [involved] []a fluky plant shortage[]).

**Page 40 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

In <u>Flowers</u>, the plaintiffs were drivers for their employer, Regency, which contracted to provide both interstate and intrastate Medicaid transport services.  <u>See</u> 535 F. Supp. 2d at 766.  The plaintiffs testified in their depositions that the interstate trips were sporadic, occurred only occasionally, "and were not a regular part of Regency's business."  <u>Id</u>. at 768.  During the relevant time, some plaintiffs never travelled out of state, while others travelled out of state only two times.  <u>Id</u>. at 769.  The plaintiffs further testified that Regency never told them that they were expected to drive across state lines.  <u>Id</u>.

The court ultimately held that the record did not support the MCA Exemption, noting that the record lacked "evidence that Regency or its employee/drivers engaged in more than de minimis interstate commerce."  <u>Id</u>. at 769.  Summarizing the relevant case law, the court stated that "the motor carrier exemption will not relieve an employer of all FLSA overtime obligations if driving in interstate commerce is not a regular and expected part of an employee's duties."  <u>Id</u>. at 770.  The court carefully noted that, although employees need not engage in a substantial volume of interstate activity, the volume of interstate activity must nonetheless be more than *de minimis* to trigger the MCA Exemption.  <u>Id</u>.

In <u>Dauphin</u>, the plaintiffs were drivers for a company in New York that provided school bus services around "Rockland County, New York, and Bergen County, New Jersey--which are on adjacent sides of the New York-New Jersey border."  <u>See</u> 544 F. Supp. 2d at 268–69.  The plaintiffs typically drove students to and home from school (called "regular runs"), but also performed "charters," for which the plaintiffs claimed that

**Page 41 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

the defendant failed to pay overtime.  Id.  The plaintiffs asserted that "few drivers ever cross[ed] state lines during regular runs."  Id. at 276.  One plaintiff stated that "she never left New York State while doing regular runs for the Rampano Central School District from the Hillburn yard," while Defendant merely stated that "some drivers" crossed state lines daily from the Hillburn yard.  Id.  Also, the record was in conflict regarding "how often drivers performed interstate charters and whether performing charters was a regular or expected part of drivers' duties."  Id.  On these premises, the court denied the defendant's motion for summary judgment as to the applicability of the MCA Exemption. Id.

In Kimball, the plaintiffs were "thirty-nine truck drivers employed by Goodyear Tire and Rubber Company (Goodyear), who haul[ed] various petroleum products to and from Goodyear's Beaumont, Texas, plant."  504 F. Supp. 545.  Goodyear rented a fleet of trucks from Ryder for the purpose of transporting petroleum products to and from the Goodyear plant in Beumont, and Goodyear hired the plaintiffs to drive those rented trucks.  Id. at 546.  All thirty-nine plaintiffs made a total of 49,392 trips, with 88 trips made in interstate commerce, or .17%.  Id. at 547.  The court held that, under these circumstances, the MCA Exemption did not apply.  Id. at 548.

In Coleman, the Secretary of Labor sued on behalf of 67 drivers who worked for the defendants, a conglomeration of companies involved in processing and sales of poultry products.  See 324 F. Supp. at 665–66.  Most of the defendants' sales and deliveries occurred in Alabama, although defendant Jiffy Poultry made some deliveries to a Florida town on the Alabama-Florida border.  Id. at 666.  Of all deliveries made

**Page 42 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

during the relevant time, only .23% of them were made to Florida.  <u>Id</u>.  The court held

that the MCA Exemption did not apply, stating that the evidence of interstate activity was

"minimal in its scope and minimal in its nature."  <u>Id</u>. at 670.

In <u>Dole</u>, the DOL sued on behalf of some of the defendant's drivers, who were

employed to haul beets on a seasonal basis.  738 F. Supp. 1313, 1315.  The defendant

asserted that all drivers, including beet haulers, could haul products in interstate

commerce, were required to meet DOT specifications, and were indiscriminately

assigned interstate hauls as they accrued throughout the year.  <u>Id</u>. at 1320.  However,

the evidence showed that the beet haul routes were purely intrastate.  <u>Id</u>. at 1315–16.

Also, the plaintiff's affidavits averred that interstate routes were not indiscriminately

assigned to all drivers.  <u>Id</u>. at 1320.  The court concluded that, "at least *some* of [the

defendant's] employees (i.e., those who were not making interstate hauls on an

indiscriminate basis) were entitled to overtime compensation after working 40 hours in

any given week."  <u>Id</u>. at 1321.

> 2.    Plaintiffs were not expected to regularly drive in interstate commerce and
> the connection between their duties and interstate commerce was *de
> minimis* from the beginning of their designation or hiring as SLB Drivers
> until at least mid-July of 2013.

Plaintiffs were not expected to regularly drive in interstate commerce and the

connection between their duties and interstate commerce was *de minimis* from the

beginning of their designation or hiring as SLB Drivers until at least mid-July of 2013.

For these two related, but independent, reasons, this Court should hold that the MCA

Exemption does not apply to Plaintiffs for this period of time.

**Page 43 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

The testimony and documentary evidence shows that both Plaintiffs and Defendants expected SLB Drivers to stay inside the State of Arkansas.  While recruiting SLB Drivers, T&T consistently told each Plaintiff that SLB Drivers were intended to drive only in Arkansas, and many Plaintiffs testified that they took the SLB Driver job *because of* its tight geographic limitations.[10]

Phillips learned about the SLB Driver job, including its limited geographic scope, from Mike Stovall ("Stovall").[11]  Prior to taking the SLB Driver job, Phillips told Stovall that Phillips was currently working a local job at Lentz, that he had visitation of his children every other weekend, that he never had an over-the-road job, and that he would never take an over-the-road job.  Phillips Dep. 26:9–28:11.  Stovall responded, telling Phillips that SLB trucks never leave Arkansas and that they stay around Searcy and Heber Springs.  Id.

Stovall made several other statements about the fact that Phillips could expect to be home every night, which further supports Stovall's statement regarding the limited geographic expectations that T&T had for SLB Drivers.  Stovall told Phillips explicitly that Phillips could expect to work five, twelve-hour days per week and to be home every

---

[10]     Plaintiffs' testimony showed a clear understanding of the difference between local drivers and over-the-road drivers, which is that local drivers *are not* expected to drive across state lines on a regular basis, while over-the-road drivers are.  See Alexander Dep. 20:25–21:8, 25:9–12; Grimes Dep. 26:10–27:15; Collum Dep. 20:21–22:1; Pritchard Dep. 30:3–10, McNeal Dep. 26:23–28:2; Davis Dep. 72:11–15; Utley Dep. 34:5–14, 36:24–25; Howland Dep. 44:3–17.  Plaintiffs fully admitted that, if and when they worked for T&T as T&T Drivers, as opposed to any periods of time in which they were designated to drive SLB trucks or were otherwise working as SLB Drivers, they understood that they would be likely to drive across state lines.  See id.

[11]     T&T employed Mike Stovall (a.k.a. "Mike Snowball") in a position that was superior to the T&T Drivers and the SLB Drivers during at least some of the relevant time.  See Grimes Dep. 65:7–9; Collum Dep. 19:7–20; Pritchard Dep. 31:9–17; Utley Dep. 29:17–21; Phillips Dep. 29:19–25.

**Page 44 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

night as an SLB Driver.  Id.  To give Phillips further assurances, Stovall explained that the sleeper cabs in the SLB trucks were so small that he could not expect his drivers to stay out overnight: "I don't expect any of my drivers to sleep in those trucks. Those sleepers aren't big enough for anybody to sleep in, so I don't expect anybody to sleep in them. Everybody is coming home." Id. at 27:21–24 (quoting Mike Stovall).

Collum learned about the SLB Driver job, including its limitation to Arkansas, from Mikal   Gumpenberger   ("Gumpenberger").[12]       See   Collum   Dep.   22:6–24:3. Gumpbenberger told Collum that the SLB trucks would stay in Arkansas because they were dedicated to the BHP shale gas wells located in Arkansas, which were previously owned by Chesapeake and purchased by BHP:

> 19 Q Okay. Did he tell you anything else other than what you
> 20 just told me about the pay and how it was going to work, five
> 21 days a week and –
> 22 A It would be Arkansas, wouldn't leave the state of Arkansas
> 23 with them; we worked strictly for BHP.
> 24 Q Who's BHP?
> 25 A BHP Billiton, the one that bought Chesapeake out.
> 1 Q So Mikal told you that you would not leave Arkansas?
> 2 A Yes. They were strictly dedicated BHP trucks, all to
> 3 Schlumberger.

Alexander learned about the SLB Driver job, including its limitation to Arkansas, from   Josh   Christian   ("Christian"),[13]   David   Andrews   ("Andrews"),[14]   and   Mikal

---

[12]     T&T employed Mikal Gumpenberger in a position that was superior to the T&T Drivers and the SLB Drivers during at least some of the relevant time.  See Collum Dep. 19:7–20; Pritchard Dep. 32:18–33:12; McNeal Dep. 25:14–26:1, Utley Dep. 28:16–19; Phillips Dep. 29:19–25; Schroeder Dep. 34:18–21.

[13]     T&T employed Josh Christian in a position that was superior to the T&T Drivers and the SLB Drivers during at least some of the relevant time.  See Alexander Dep. 18:5–6; Collum Dep. 19:7–20; Pritchard Dep. 32:11–16; McNeal Dep. 25:14–26:1; Schroeder 72:6–8.

**Page 45 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Gumpenberger.  Alexander Dep. 53:16–54:13.  They each told Alexander that the trucks were not allowed to leave Arkansas.  Id.  At the time of accepting the SLB Driver job, based on what he was told about the job, Alexander had an understanding that he would not have to drive out of the State of Arkansas as an SLB Driver.  Alexander Dep. 53:16–54:13, 90:6–25.  Alexander understood that he would not have to drive out of the State of Arkansas as an SLB Driver because T&T told him that his days per week would be limited to five, that his hours would be limited to twelve per day, and that the SLB trucks were not allowed to leave the State of Arkansas, and because the sleeper cab in the SLB trucks were too small to comfortably stay in for long periods of time.  See Alexander Dep. 53:19–24, 90:6–92:4.

Grimes learned about the the SLB Driver job, including it limited geographic scope, from Gumpenberger as well.  See Grimes Dep. 32:16–33:4.  Just after T&T received the first set of SLB trucks, while Grimes was learning how to operate them, Gumpenberger told Grimes that the SLB job would keep Grimes in the State of Arkansas:

> [W]e was trying to learn how to operate the pumps and how to unload and everything back on the yard there in Morrilton. We was filled up with sand and then we went to this other building and unloaded it so we knew how to unload, figure out how to unload it. And Mikal, he stopped me and asked me if I wanted to do this full-time. And I asked him, I said, "Will it keep me in the state of Arkansas?" And he said yes, and I said, "Fine, I'll do it." And that's when he broke it all down, telling me what it paid and everything like that.

---

[14]   T&T employed David Andrews in a position that was superior to the T&T Drivers and the SLB Drivers during at least some of the relevant time.  See Alexander Dep. 18:5–6; Collum Dep. 19:7–20.

**Page 46 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Grimes Dep. 32:16–33:4.   Grimes testified that the geographic limitation of the SLB

Driver job was a motivating factor for why Grimes accepted the job, as stated in his

deposition:

> Q. Okay. So then you tell me that Mikal asked you if you wanted to drive
> the Schlumberger truck and you specifically remember asking him
> whether or not it would keep you in Arkansas, and he said yes. Is that
> correct?
> A Yes. To me, that was my "okay, I'll do it" point.
> Q Well, why did that make a difference to you?
> A Because I was tired of being over-the-road.

Grimes Dep. 33:20–34:1.

McNeal also learned about the SLB Driver job and its limitation to Arkansas from

Gumpenberger (a.k.a. "Whiskey"), in addition to other individuals who were already

designated as SLB Drivers.   McNeal Dep. 28:7–29:16, 30:3–23.   Other SLB Drivers told

McNeal that SLB Drivers were dedicated to the BHP wells in Arkansas, and

Gumpenberger confirmed this geographic limitation when McNeal asked him about it.

See id.

Pritchard learned about the SLB Driver job, including its Arkansas geographic

limitation, from Stovall and Plaintiff McNeal.   Pritchard Dep. 31:9–17.   Mike Stovall told

Pritchard that SLB Drivers were intended to stay in Arkansas and work five days per

week. Pritchard Dep. 31:9–32:6, 108:18–20.   McNeal was already an SLB Driver at the

time that Pritchard learned about the SLB Driver job, and Pritchard had observed that

McNeal was driving only in Arkansas and working five days per week, just prior to

speaking with Mike Stovall about the SLB Driver job.   Pritchard Dep. 31:9–32:6.   Also,

**Page 47 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Pritchard took the SLB Driver job, despite an accompanying pay cut, because he wanted to stay in Arkansas.  Pritchard Dep. 53:22–24, 62:23–63:4.

Davis learned about the SLB Driver job, including its limited geographic scope, from Christian and Gumpenberger.  Davis Dep. 70:1–72:6.  They both told Davis that he would drive only in the State of Arkansas as an SLB Driver because they were dedicated to servicing the BHP wells in Arkansas.  Id.  They also told Davis that SLB Drivers were intended to work twelve hours per day, five days per week.  Id.  Similar to Pritchard, Davis took a pay cut to take the SLB Driver job.  Id.

Utley learned about the SLB Driver job, including its *intrastate* nature, from Gumpenberger.   Utley Dep. 37:8–38:12.   Gumpenberger told Utley that SLB Drivers would stay in Arkansas servicing BHP wells, would go home every night, and would work twelve hours per day and five days per week, as stated in his deposition and recounted below:

> 8 Q How did you find out about driving the Schlumberger truck?
> 9 A Whiskey.
> 10 Q All right. And what did Whiskey tell you about driving
> 11 the Schlumberger truck?
> 12 A He said, "I have a job for you. It's $1400 a week, five
> 13 days a week, two days off, 12-hour days, and you're going to
> 14 bring that truck back to the yard every day." And I said,
> 15 "Thank you, Jesus, and you, too, Whiskey."
> 16     MR. UTLEY: You can delete that part.
> 17     MR. LANGDON: Oh, no, that's too good of
> 18     reading.
> 19     MR. UTLEY: Yeah.
> 20     MR. SANFORD: That's the stuff that we've got to
> 21     have in there.
> 22     MR. UTLEY: Okay. And this was at the Hector
> 23     gas station where he purchases fuel and cigarettes.
> 24 MR. LANGDON: (continuing)
> 25 Q All right, sir. Did he tell you anything else about

**Page 48 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

1 driving the Schlumberger truck?
2 A He said, "It's all right here."
3 Q What does "all right here" mean?
4 A Faulkner County, you know, just Arkansas. When we say
5 Arkansas, it's basically servicing BHP wells.
6 Q Did Whiskey tell you that you would only drive in the
7 state of Arkansas, while you were driving the Schlumberger
8 truck?
9 A He'd have had to. Yes. Yes. I'm going to say yes.
10 Q Are you saying yes because you're guessing or are you
11 saying yes because he told you that?
12 A I'm saying it because he said so.

Utley Dep. 37:8–38:12.  Thus, Utley always expected to drive only within the State of Arkansas as his regular and normal duties because that is what "Whiskey" told him. See Utley Dep. 102:14–19.

Houpt learned about the SLB Driver job, including its limitation to Arkansas, from Heaven Porter.[15]  Houpt Dep. 33:6–13, 77:20–78:18.  Heaven told Houpt that, as an SLB Driver, Houpt would drive only in the State of Arkansas and would work twelve hours per day, five days per week.  Houpt Dep. 77:20–78:18.  Houpt accepted the SLB Driver job because of, and in reliance upon, the promise that SLB Drivers drove only in the State of Arkansas.  See Houpt Dep. 78:19–79:2 (explaining that he wanted to be close to home).

Prior to T&T's statements regarding SLB Drivers staying in Arkansas, BHP Billiton Ltd. ("BHP"), purchased Chesapeake Energy Corp.'s ("Chesapeake"), shale gas assets *located in Arkansas*.  See Collum Dep. 23:19–24:3 (stating that T&T told him

---

[15]    T&T employed Heaven Porter as a dispatcher and as acting terminal manager during at least some of the relevant time.  See Collum Dep. 19:7–20; Pritchard Dep. 33:14–24; Utley Dep. 30:4–8 (noting that he considered her a supervisor) Houpt Dep. 30:7–17 (noting that Heaven hired Houpt); Phillips Dep. 29:19–25 (noting that Heaven was acting terminal manager for some period of time).

**Page 49 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

that the SLB trucks were dedicated to the BHP wells that BHP had purchased from Chesapeake); Ex. 23, BHP Billiton, *BHP Billiton Announces Acquisition of Chesapeake Energy Corporation's Fayetteville USA, Shale Assets*, www.bhpbilliton.com (Feb. 22, 2011),

http://www.bhpbilliton.com/home/investors/news/Pages/Articles/BHP%20Billiton%20Announces%20Acquisition%20Of%20Chesapeake%20Energy%20Corporation's%20Fayetteville%20USA,%20Shale%20Assets.aspx (explaining that BHP had agreed to purchase Chesapeake's shale oil assets in Arkansas); Ex. 24, Gina Chon and Robert Guy Matthews, *BHP to Buy Chesapeake Shale Assets*, www.wsj.com (Feb. 22, 2011), http://www.wsj.com/articles/SB10001424052748703800204576158834108927732 (same); Ex. 25, Michael J. De La Merced, *BHP Billiton Buys Shale Gas Assets in Arkansas*, www.nytimes.com (Feb. 22, 2011), http://query.nytimes.com/gst/fullpage.html?res=950CE5D7153CF931A15751C0A9679D8B63 (same); Ex. 26, James Paton, *BHP to Buy Chesapeake Shale Gas Assets for $4.75 Billion*, www.bloomberg.com (Feb. 22, 2011), http://www.bloomberg.com/news/articles/2011-02-21/bhp-buys-chesapeake-unit-for-4-75-billion-adding-u-s-shale-gas-assets (same)..   Also, at some point in time, SLB entered into an agreement with BHP that obligated SLB to frack the Arkansas shale gas wells that BHP purchased from Chesapeake.   See McNeal Dep. 30:21–23 (affirming that Schlumberger was doing the work at the BHP wells); Pritchard Dep. 37:23–40:13 (describing an incident that occurred "on the BHP well") (noting that BHP and Schlumberger "worked together").

**Page 50 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Meanwhile, around March of 2011, SLB and T&T entered into an agreement for T&T to provide SLB with T&T drivers to operate a dedicated fleet of SLB's trucks to service the BHP wells in Arkansas.  See Smith Decl. ¶ 31, ECF No. 8-2 (admitting that the Defendants entered into an agreement); Grimes Dep. 28:3–19 ("they call them dedicated . . . Q. . . . who is they? . . . A. . . . Josh and Mike, Mikal"); see also, Collum Dep. 23:19–24:3 (describing how Mikal Gumpenberger told Collum that the SLB trucks were dedicated to BHP shale gas wells in Arkansas). These trucks were specially assigned to Arkansas, as evidenced by Bill Smith's statement that, around October of 2013, "Schlumberger chose to *reassign their twelve (12) trucks to . . . Oklahoma . . . .*" Smith Decl. ¶ 35, ECF No. 8-2.  All these facts go to show Defendants' initial intent for the SLB trucks and SLB Drivers to operate primarily in Arkansas.

Consistent with T&T's recruiting talking points and the overall business circumstances, SLB Drivers primarily hauled frack sand in Arkansas for approximately a year and a half, from January 16, 2012, through mid-July of 2013.  See generally, Exs. 4, 6, 8, 10, 13, 15, 17, 20, 22 (Schlumberger's E-Journey Reports) (showing location records for most Plaintiffs).

The few occasions when SLB Drivers drove across state lines during this period of time were for extraordinary purposes, outside of their normal, primary sand-hauling duties.  See Pritchett, 2013 U.S. Dist. LEXIS 121430 at *26–27 (considering the purpose or cause of the interstate trips).  Specifically, from January 16, 2012, through mid-July of 2013, SLB Drivers left Arkansas only if the trip involved inspections or equipment relocations.  See Alexander Dep. 80:2–8 (truck inspection); Grimes Dep.

**Page 51 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

27:22–28:8 (picking up SLB dedicated fleet trucks from Louisiana); Grimes Dep. 78:1–8 (inspections); Collum Dep. 44:2–45:17 (inspection); Collum Dep. 46:10–47:1 (equipment move); Pritchard Dep. 63:5–17, 88:24–89, 92:21–95:2 (equipment move and inspection); Pritchard Dep. 66:14–16 (explaining that he never hauled sand to wells outside of Arkansas in a SLB truck); McNeal Dep. 53:12–54:2 (inspection); Davis Dep. 27:5–11 (equipment move); Utley Dep. 72:20–73:17 (pick up SLB trucks from Louisiana)[16]; Schroeder Dep. 100:15–23 (inspection); Howland Dep. 45:21–46:1, 47:5–10 (pick up SLB trucks from Louisiana).  This includes two times in which some Plaintiffs rode to Louisiana to bring the SLB fleet to Arkansas for the purpose of operating the SLB fleet in support of the Schlumberger contract to service the BHP wells in Arkansas. See id.[17]

Even counting these extraordinary trips, the E-Journey system logged a *minute* percentage of days in which each Plaintiff was located outside the State of Arkansas in

---

[16]    In addition to picking up the SLB fleet from Louisiana one time, on September 11, 2012, Utley drove a SLB truck to Texas one time for the purpose of having the truck inspected. Compare Ex. 15 Bates D-00219 (showing Utley's location record in Texas on 9/11/2012) with Pritchard Dep. 92:21–93:3 (noting that, on September 11, 2012, he brought his truck to Texas for an inspection); Schroeder Dep. 100:15–23 (noting that he drove to Texas one time to have his truck inspected); Ex. 20 Bates D-00238 (showing Schroeder's trip to Texas for the purpose of inspection on September 11, 2012); compare also with Alexander Dep. 80:2–8 (drove to Texas for inspection September 6, 2012); Grimes Dep. 78:1–8 (drove to Texas for inspections); Ex. 6 Bates D-00124 (showing Grimes's trip to Texas for inspection on August 31, 2012, Bates D-00125 (showing Grimes's trip to Texas for inspection on September 20, 2012); Collum Dep. 44:2–45:17 (explaining that his trips to Texas were for inspection); Ex. 8, Bates D-00188 (showing Texas trips for inspection on August 31, 2012 and September 6, 2012, including record for Lakeport, Texas); but cf., Utley Dep. 75:16–18 (speculating that the only reason for the Texas trip "would've been to get a load of sand").

[17]    For the trips to Texas for inspections, although some Plaintiffs hauled sand back from Texas to Arkansas, this was only incidental to the main purpose of the trip.

**Page 52 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

an SLB truck.[18]  See Ex. 27 (showing number of days each Plaintiff was employed as an SLB Driver during the stated period, number of out of state logs from the E-Journey system, and percentage of out of state days).  As an SLB Driver, from August 24, 2012, through July 18, 2013, Alexander drove out of the State of Arkansas only one time out of 328 days, or 0.305%.  See Ex. 4, Bates D-00040, 9/6/2012; Ex. 27.  Between January 16, 2012, and July 21, 2013, Grimes drove across state lines only five times out of 552 days, or 0.906%.  See Ex. 6, Bates D-00101, 1/16/2012, Bates D-00107, 4/10/2012, Bates D-00124, 8/31/2012, Bates D-00125, 9/20/2012, Bates D-00131, 5/23/2013; Ex. 27.  Between January 29, 2012, and December 17, 2012, Collum drove out of the State of Arkansas only three times out of 323 days, or 0.929%.  See, Ex. 8; Ex. 27.  Between May 9, 2012, and June 5, 2013, Pritchard drove out of the State of Arkansas only four times out of 392 days, or 1.020%.  See, Ex. 10; Ex. 27.  Between April 22, 2012, and May 3, 2013, McNeal drove out of the State of Arkansas only one time out of 376 days, or 0.266%.  McNeal Dep. 53:12–54:2, 56:16–18; Ex. 27.  Between January 30, 2012, and May 1, 2013, Davis drove out of the State of Arkansas only one time out of 457 days, or 0.219%.  Ex. 13, Bates D-00150 (showing a trip to Oklahoma on 5/9/2012); Ex. 27.  Between January 18, 2012, and July 2, 2013, Utley drove out of the State of

_____

[18]    Plaintiffs do not necessarily endorse this "day-percentage" analysis as the only method for showing how rarely Plaintiffs drove out of state, but it is used for illustrative purposes because no better data is available.  The problem with this "day-percentage" analysis is that it does not, as Coleman, 323 F. Supp. 665–66 and Kimball, 504 F. Supp. 547 do, account for the total number of trips that each Plaintiff actually drove.  Thus, if some Plaintiffs, as SLB Drivers, drove more than one trip per day while performing their typical Arkansas sand hauling duties, then their percentage of out-of-state trips would be even lower.  Nonetheless, because the E-Journey Records show approximately one percent or less of out-of-state records for each Plaintiff through July of 2013, it is sufficient to illustrate, as a starting point, just how rarely Plaintiffs drove out of the State of Arkansas.

**Page 53 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Arkansas only two times out of 531 days, or 0.377%.  Ex. 15, Bates D-00203, 4/10/2012 (showing record in Shreveport, Louisiana), Bates D-00219, 9/11/2012 (showing records in Louisiana and Lakeport, Texas); Ex. 27.

Finally, Houpt and Phillips never drove out of the State of Arkansas as SLB Drivers prior to July 19, 2013, and July 25, 2013, respectively.  Between March 14, 2013, and July 18, 2013, Houpt never drove outside the State of Arkansas as an SLB Driver.  See, Ex. 17 (showing no out of state records until July 19, 2013); Ex. 27.  As an SLB Driver, from January 15, 2013, until approximately July 25, 2013, Phillips never drove out of the State of Arkansas.  See Phillips Dep. 51:22–52:7 (noting that he drove out to Oklahoma when the trucks went there "for that month, or whatever"); 54:24–55:6 (noting that he went to Oklahoma a week after Houpt left, but came back to Arkansas at the same time as John Houpt, so Phillips was there for a week less than Houpt); cf. Houpt Dep. 101:14–16 (noting that the Oklahoma stint lasted "around a month"); see also, Ex. 17 Bates D-00096–00099 (showing Houpt's location records for Oklahoma and Texas from July 18, 2013, through August 21, 2013); Ex. 27.

Consistent with the parties' intent for SLB Drivers to primarily haul sand in Arkansas, several Plaintiffs quit driving for T&T because they believed that T&T was going to require them to drive across state lines on a regular basis.  Houpt quit working for T&T because T&T was going to permanently transfer him to a Tutle truck and told him that he would have to start driving to Texas and New Mexico.  Houpt Dep. 107:5–12.  Toward the end of September, T&T told Phillips that the SLB trucks were being taken away and that Phillips would have to start driving Tutle trucks.  Phillips Dep. 92:1–

**Page 54 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

93:25.  T&T then scheduled Phillips to drive to North Dakota.  <u>Id</u>.  Upon learning that he would be required to drive Tutle trucks and that he would be dispatched to North Dakota, Phillips decided to terminate his employment with T&T.  <u>See id</u>.

In sum, Plaintiffs, as SLB Drivers, were not expected to drive across state lines as part of their ordinary job duties,[19] and the relationship between Plaintiffs' primary duties and "interstate commerce" was *de minimis*.[20]  BHP purchased Chesapeake's

---

[19]     As stated by the relevant regulations and cases, drivers must be "***likely*** to be[] called upon in the ***ordinary*** course of [their] work to perform, either regularly or from time to time," interstate safety-affecting activities.  29 C.F.R. § 782.2(b)(3); <u>see also</u>, <u>Morris</u>, 332 U.S. at 433 (holding drivers exempt where, *inter alia*, their interstate trips were "a natural, integral and apparently inseparable part of the common carrier service of the [employer] and of his drivers"); <u>Masson</u>, 2005 U.S. Dist. LEXIS 18022 at *24 ("Driving in interstate commerce alone does not trigger the motor carrier exemption. ***Such driving, however frequent, must have been an expected and regular part of an employee's job duties***." (emphasis added)); <u>Flowers</u>, 535 F. Supp. 2d at 770 ("the motor carrier exemption will not relieve an employer of all FLSA overtime obligations if driving in interstate commerce is not a ***regular and expected part of an employee's duties***").  Put another way, jurisdiction does not even attach, "if the possibility of interstate driving is remote." Op. and Order at 4, <u>Phillips</u>, No. 4:11CV00776-JLH, <u>filed in this case as</u> ECF No. 10-2 (citing Application of the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37.902, 37.903 (July 23, 1981).  The court carefully <u>Id</u>.

[20]     <u>See</u> <u>Flowers</u>, 535 F. Supp. 2d at 770 (noting that, although employees need not engage in a substantial volume of interstate activity, the volume of interstate activity must nonetheless be more than *de minimis* to trigger the MCA Exemption); <u>see also</u>, <u>Seagram</u>, 2014 U.S. Dist. LEXIS 148721 at *16–17 (denying employer's motion to dismiss where there was a factual dispute over whether the employee's transport duties "involved sufficient interstate commerce or whether instead his involvement was only *de minimis*"); <u>Barrios</u>, 2013 U.S. Dist. LEXIS 175155 at *18–20 (denying summary judgment to employer where evidence suggested that the plaintiffs were assigned to semi-permanent, ***intrastate*** routes); <u>Pritchett</u>, 2013 U.S. Dist. LEXIS 121430 at *26–27 (holding that, where "the amount of interstate travel (four short trips in over three years), the timing of the trips (confined to a single week), the cause of the trips (a fluky plant shortage) and the distribution of the assignment (a single driver making ¾ of the trips," the plaintiff drivers were not "likely" to be called upon to drive interstate "from time to time"); <u>Hoffman v. First Student, Inc.</u>, 2009 U.S. Dist. LEXIS 53542 at *19–20 (denying summary judgment to employer where the plaintiffs worked "fewer than two interstate trips per year" during the relevant time); <u>Dauphin</u>, 544 F. Supp. 2d at 275 ("for the motor carrier exemption from the FLSA to apply, defendants here must establish either that the activities of the individual plaintiffs involved interstate travel of a character that was more than de minimis or that interstate travel was a 'natural, integral and . . . inseparable part' of the position plaintiffs held [sic] (citing <u>McComb</u>, 332 U.S. at 433)); <u>Masson</u>, 2005 U.S. Dist. LEXIS 18022 at *23 ("where the employer's interstate activities affecting the safety of interstate motor operations are de minimis, the employer's exemption from FLSA requirements under the MCA consequently fades [sic]" (internal quote marks omitted)); Op. and Order at 4, <u>Phillips</u>, No. 4:11CV00776-JLH, <u>filed in this case as</u> ECF No. 10-2 (noting that jurisdiction by the DOT does not attach, and therefore, the MCA Exemption does not apply, "if the possibility of interstate driving is remote") (citing Application of

**Page 55 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Arkansas shale oil assets, Schlumberger agreed to frack them, and T&T agreed to provide the drivers and assign them to a special dedicated fleet of SLB trucks. Consistent with this arrangement, Defendants told Plaintiffs that SLB Drivers were intended to stay in Arkansas, and Plaintiffs accepted the SLB Driver job openings in reliance upon those representations.  Some Plaintiffs testified that they took a pay cut to take the SLB Driver job.  Others testified that they quit when they found out that would likely be driving cross-country again because the SLB trucks were being reassigned to Oklahoma.  The SLB trucks had relatively small sleepers not designed for long-haul interstate trips.

Further, the rarity of and purposes for Plaintiffs' interstate travel is indicative of both the *de minimis* connection between Plaintiffs' duties and interstate commerce and Plaintiffs' and Defendants' expectations that SLB Drivers were intended primarily to haul frack sand in Arkansas.  Plaintiffs' primary duty was to haul frack sand to shale oil wells, and for a year and a half after the start of the SLB Driver job, each Plaintiff drove out of state approximately between 0% and 1% while they were designated as SLB Drivers.[21]

---

the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37.902, 37.903 (July 23, 1981); Lieberman, 2005 U.S. Dist. LEXIS 45222 at *5 ("If the employer or employee's involvement in interstate commerce could be characterized as de minimus, they may not be subject to the Secretary of Transportation's jurisdiction at all, and thus are not covered by the Motor Carrier Act." [sic]); Dole, 738 F. Supp. at 1322 ("a driver is not exempt under the Motor Carrier Act merely because he takes one or two interstate trips"); Kimball, 504 F. Supp. at 547–48 (holding that MCA Exemption did not apply where only 0.17% trips were interstate, the interstate trips were not shared indiscriminately among all the drivers, and the interstate trips were made, on average, once every three weeks); Coleman, 324 F. Supp. at 668–71 (S.D. Ala. 1970), aff'd regarding de minimis exception to MCA Exemption at, 458 F.2d 1139 (5th Cir. 1971) ("the court does not feel constrained to allow [the MCA] exemption . . . on the basis of a minimum of evidence of interstate activity which is minimal in its scope and minimal in its nature").

[21]    Cf. Kimball, 504 F. Supp. at 547–48 (holding that MCA Exemption did not apply where only 0.17% trips were interstate, the interstate trips were not shared indiscriminately among all the

**Page 56 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Accordingly, through the middle of July of 2013, Plaintiffs drove out of the State of Arkansas only if the purpose involved inspections, fleet additions, or equipment moves,[22] but never for the bare purpose of hauling sand to wells.  In other words, Plaintiffs drove out of state only if the purpose also involved something other than their primary duty of hauling fracking sand.[23]

For all these reasons, the MCA Exemption does not apply to Plaintiffs from the date they each became an SLB Driver through mid-July of 2013.

      3.      **Plaintiffs Who Were Still Working as SLB Drivers in Mid-July of 2013 Were Not Expected to Regularly Drive in Interstate Commerce Through the End of the SLB Driving Job Position, Despite a Temporary Assignment to Oklahoma and Texas.**

Plaintiffs who were still working as SLB Drivers in mid-July of 2013 were not expected to regularly drive in interstate commerce through the end of the SLB Driver job position, despite a temporary assignment to Oklahoma and Texas.  Starting around July 18, 2013, some Plaintiffs (those who were still working as SLB Drivers) worked temporarily in Oklahoma and Texas due to a work slow-down on the Arkansas BHP

---

drivers, and the interstate trips were made, on average, once every three weeks); <u>Coleman</u>, 324 F. Supp. at 668–71 (S.D. Ala. 1970), <u>aff'd regarding de minimis exception to MCA Exemption at</u>, 458 F.2d 1139 (5th Cir. 1971) ("the court does not feel constrained to allow [the MCA] exemption . . . on the basis of a minimum of evidence of interstate activity which is minimal in its scope and minimal in its nature"); <u>see also</u>, <u>Flowers</u>, 535 F. Supp. 2d at 770 (noting that, although employees need not engage in a substantial volume of interstate activity, the volume of interstate activity must nonetheless be more than *de minimis* to trigger the MCA Exemption).

[22]    <u>See</u> <u>Pritchett</u>, 2013 U.S. Dist. LEXIS 121430 at *26–27  (holding that the plaintiff drivers were not "likely" to be called upon to drive interstate "from time to time," where *inter alia*, "the cause of the trips [involved] []a fluky plant shortage[]).

[23]    While some Plaintiffs returned to Arkansas from the Texas truck inspections with sand, they went down to Texas empty and, nevertheless, went down only because the trucks needed to be inspected.  The inclusion of sand on the return trip, therefore, was only incidental to the main purpose of the trip, inspections.

**Page 57 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

wells.  See Houpt Dep. 101:14–16 (stating that he was out in Oklahoma and Texas for about a month); see also, Ex. 17 (July 18, 2013 to August 21, 2013); See Phillips Dep. 51:22–52:7 (noting that he drove out to Oklahoma when the trucks went there "for that month, or whatever"); 54:24–55:6 (noting that he went to Oklahoma a week after Houpt left, but came back to Arkansas at the same time as John Houpt, so Phillips was there for a week less than Houpt); cf. Houpt Dep. 101:14–16 (noting that the Oklahoma stint lasted "around a month"); see also, Ex. 17 Bates D-00096–00099 (showing Houpt's location records for Oklahoma and Texas from July 18, 2013, through August 21, 2013); See Ex. 4 (showing Alexander out from July 19, 2013 to August 21, 2013); Ex. 6 (showing Grimes out from July 21, 2013, to August 20, 2013); Ex. 20 (showing Schroeder out from July 23, 2013 to August 20, 2013).[24]

Despite this temporary Oklahoma-Texas assignment, the record evidence suggests that the understanding that SLB Drivers were primarily intended to drive in Arkansas never changed.  Prior to the SLB Drivers going to Oklahoma and Texas, T&T stated that it would last only a week or two.  See Houpt Dep. 80:18–81:9 (stating that he was told this).  Schroeder testified that his expectation as to driving in Arkansas never changed, despite the Oklahoma-Texas assignment.  See Schroeder Dep. 128:6–18. Also, T&T allowed the SLB Drivers to choose voluntarily whether to drive in Oklahoma. Cf. Houpt Dep. 100:22–101:2 (stating that he was allowed to choose whether to go, voluntarily); but cf. Alexander Dep. 71:22–25.  The reason that T&T asked the SLB

---

[24]     Although Ex. 20 shows a location log for Colorado on September 29, 2013, Randy Schroeder never actually drove to Colorado.  Schroeder Dep. 111:23–112:18 (stating that he never drove to Colorado); see also, Schroeder Dep. 75:1–10 (stating that he stopped driving SLB trucks on September 10, 2013).

**Page 58 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Drivers to go to Oklahoma and Texas due to a temporary slow-down in fracking in Arkansas.  See Schroeder Dep. 104:1–24.  When the SLB Drivers left for the temporary stint in Oklahoma and Texas, they left with an empty trailer, and when they returned, they returned with an empty trailer.  Cf. Phillips Dep. 55:24–56:1.  Additionally, when Plaintiffs returned from the Oklahoma-Texas assignment, they returned again to driving routes in Arkansas.  See Exs. 4, 6, 17, 20.  All these facts show that the SLB Drivers, despite this assignment in Oklahoma and Texas, were not expected to *regularly* drive across state lines.

Also, during Phillips's stint in Oklahoma and Texas, the name of the state changed, but his primary duty of driving intrastate routes hauling sand to oil wells did not.  Phillips never transported sand across state lines.  Phillips Dep. 56:2–9.   He brought Texas sand to Texas wells, and Oklahoma sand to Oklahoma wells.  Id.

Finally, even Defendants continued to expect the SLB trucks to be assigned to Arkansas, as evidenced by the fact that they were not "reassigned" to Oklahoma until October of 2013.  See Smith Decl. ¶ 35, ECF No. 8-2, (explaining that around October of 2013, "Schlumberger chose to ***reassign their twelve (12) trucks to . . . Oklahoma*** . . . .").

In sum, the Oklahoma-Texas assignment did not change the parties' expectations as to where Plaintiffs were expected to drive on a regular basis.  Therefore, the MCA Exemption does not apply to Plaintiffs through the end of the SLB Driver job, despite the temporary Oklahoma-Texas assignment.

**Page 59 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

**D.    The MCA Exemption Cannot Apply to Certain Plaintiffs in this Case Because T&T Undermined the Public Policy Goals of the MCA Exemption.**

The MCA Exemption cannot apply to certain Plaintiffs in this case because T&T intentionally undermined the public policy goals of the MCA Exemption.  Accordingly, Plaintiffs ask this Court to define and adopt a narrow public policy exception to the MCA Exemption and apply that exception in this case.  In the alternative, T&T should be estopped from claiming the MCA Exemption as a defense to Plaintiffs' overtime claims.

The public policy goals of the FLSA and the AMWA include protecting workers from unfair working conditions.  See 29 U.S.C.S. § 202 (LEXIS 2015) (explaining that the purpose of the act is to protect against "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . . ."); see also, Ark. Code Ann. § 11-4-202 (LEXIS 2015).  The policy goal of the MCA Exemption is to prevent overlap in the competing hours requirements of the DOT and the FLSA and to promote the DOT's hours of service limits.  See D'Arpa, 2013 U.S. Dist. LEXIS 85697 at *20–22.  The policy goal of the DOT's hours of service regulations is to promote efficiency and safety on the public highways.  Id. (explaining that Congress gave the DOT authority to regulate hours of service "to promote efficiency, economy, and safety in interstate motor transport").

In light of these policy goals, Plaintiffs ask this Court to adopt a narrow public policy exception to the MCA Exemption, defined as follows or as further defined or refined by this Court:

> Where a Commercial Motor Carrier subject to jurisdiction by the DOT acts or speaks in a way that would cause a reasonable employee to feel compelled or encouraged to work in excess of the DOT's hours of service

**Page 60 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

limits or to falsify the employee's records of work in excess of the DOT's limits, then the Commercial Motor Carrier cannot claim the benefit of the MCA Exemption as to any employee who actually worked in excess of the DOT's hours of service limits or falsified his or her records because the employee reasonably felt compelled or encouraged to do so as a result of the employer's direct or indirect compulsion or encouragement.

As defined above, this public policy exception would promote without preference the policies that the MCA Exemption, the Motor Carrier Act, and the FLSA and AMWA are intended to promote and would prevent conflict between the hours limitations under the DOT and the hours limitations under the FLSA and AMWA.   To explain, this exception is limited by an objective test.   The employer must act in a way that would lead a *reasonable employee* to feel compelled to contradict the DOT's regulations.

It is further limited by a subjective reasonableness test and a causation test.   The employee must have actually felt compelled to contradict the DOT's regulations as a result of the employer's encouragement or direction.   The subjective reasonableness imputes a limitation on the period of time in which an employee can fall under this exception.   Although an employee may reasonably feel compelled to violate the DOT's regulations in week 1, if the employer implements a *bona fide* program of compliance in week 43, then the employee cannot reasonably claim this exception in week 44 on the basis of the compulsion that occurred in week 1.   Thus, an employer can stop this exception from applying after a period of noncompliance by simply implementing an open and reasonable effort to encourage and direct compliance with the DOT's regulations.

It is also limited to employees who actually follow through with the employer's encouragement or directives, thus preventing conflict between the competing policy

**Page 61 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

goals of the FLSA and the DOT hours of service regulations.  If the employee is unwilling to actually violate the DOT's regulations, then the safety goal of the DOT's regulations is not undermined, and there is no need to disregard the MCA Exemption.

In this case, T&T, through at least some of its agents, including Billy Vest, Mike Stovall, Heaven Porter, or other dispatchers, either impliedly or explicitly, encouraged or directed Alexander, Grimes, Davis, Phillips, Schroeder, and Howland, as SLB Drivers, to work in excess of the hours of service limits set by the DOT.  See Alexander Dep. 97:13–98:2, 99:24–101:10; Grimes Dep. 48:7–51:4, Grimes Dep. 5:21–7:3, Mar. 30, 2015; Davis Dep. 45:5–46:22; Houpt Dep. 51:18–52:17; Phillips Dep. 79:16–81:23, 97:17–99:13; Schroeder Dep. 29:22–49:21; Howland Dep. 40:10–41:5, 41:14–42:15, 64:16–65:20.

Additionally, for weeks in which Plaintiffs, as SLB Drivers, worked in excess of the hours of service limits set by the DOT, T&T, through at least some of its agents, including Billy Vest, Mike Stovall, Heaven Porter, or other dispatchers, either impliedly or explicitly, encouraged or directed Alexander, Grimes, Davis, Phillips, Schroeder, and Howland to falsify their DOT logs to reflect that the Plaintiffs had not worked in excess of the DOT's hours of service limits.  See id.

These Plaintiffs' perceptions as to T&T's desire for Plaintiffs to violate the DOT's regulations were reasonable.  See id.  A reasonable employee under these circumstances, being threatened on occasion with removal from SLB trucks or being asked to pull more loads despite having just informed their employer that they were out of hours, would believe that they were being asked to violate the DOT's regulations.

**Page 62 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

See id.  The other Plaintiffs, who were told to fix their log books after logging their actual hours of service, would also be entitled to the public policy exception.  See id.

Therefore, this Court should apply a public policy exception to the MCA Exemption to Plaintiffs Alexander, Grimes, Davis, Phillips, Schroeder and Howland. T&T undermined the policy objectives of the MCA Exemption and the DOT's regulations, and therefore, should not be allowed to obtain their benefits.

In the alternative, this Court should estop T&T from asserting the MCA Exemption as to Alexander, Grimes, Davis, Phillips, Schroeder and Howland for the same factual reasons discussed above.

## VIII.    CALCULATION OF DAMAGES

An employer who fails to pay overtime to a non-exempt employee is liable to the employee for the unpaid overtime.  See 29 U.S.C.S. § 216(b) (LEXIS 2015).  This Section is dedicated to issues related to the calculation of damages upon a finding of liability.  Specifically, Plaintiffs seek summary judgment that Plaintiffs' regular rate and overtime rate are calculated based upon a 60 hour workweek and that the Fluctuating Work Week method ("FWW") of calculating damages does not apply.

**A.    Plaintiffs' Regular Rate and Overtime Rate are Calculated Based upon a 60 Hour Workweek and the Fluctuating Work Week Method of Calculating Damages Does not Apply.**

Plaintiffs' regular rate and overtime rate are calculated based upon a 60 hour workweek and the FWW method of calculating damages does not apply.  Section 1 below explains the relevant legal methods for calculating damages.  Section 2 explains

**Page 63 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

why this Court must calculate Plaintiffs' regular rate and overtime rate based upon the 60 hour workweek and, accordingly, why the FWW does not apply in this case.

1.    If an employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate.

"If [an] employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate."[25]   29 C.F.R. § 778.113 (LEXIS 2015).   The regulations provide several examples of how this works when the salary is intended to compensate the employee for equal to or less than forty hours per week:

> If an employee is hired at a salary of $350 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $350 divided by 35 hours, or $10 an hour, and when the employee works overtime the employee is entitled to receive $10 for each of the first 40 hours and $15 (one and one-half times $10) for each hour thereafter. If an employee is hired at a salary of $375 for a 40-hour week the regular rate is $9.38 an hour.

Id.  Another similar example reads as follows:

> If an employee whose maximum hours standard is 40 hours[26] was hired at a salary of $200 for a fixed workweek of 40 hours, his regular rate at the time of hiring was $5 per hour. If his workweek is later reduced to a fixed workweek of 35 hours while his salary remains the same, it is the fact that it now takes him only 35 hours to earn $200, so that he earns his salary at the average rate of $5.71 per hour. His regular rate thus becomes $5.71 per hour; it is no longer $5 an hour. Overtime pay is due under the Act only

---

[25]    This means that the regular rate is determined, in part, upon the employment agreement of the parties.  See id.

[26]     As opposed to police officers and firefighters who may work more than 40 hours per week before being entitled to overtime.

**Page 64 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

for hours worked in excess of 40, not 35, but if the understanding of the parties is that the salary of $200 now covers 35 hours of work and no more, the employee would be owed $5.71 per hour under his employment contract for each hour worked between 35 and 40. He would be owed not less than one and one-half times $5.71 ($8.57) per hour, under the statute, for each hour worked in excess of 40 in the workweek. In weeks in which no overtime is worked only the provisions of section 6 of the Act, requiring the payment of not less than the applicable minimum wage for each hour worked, apply so that the employee's right to receive $5.71 per hour is enforceable only under his contract. However, in overtime weeks the Administrator has the duty to insure the payment of at least one and one-half times the employee's regular rate of pay for hours worked in excess of 40 and this overtime compensation cannot be said to have been paid until all straight time compensation due the employee under the statute or his employment contract has been paid. Thus if the employee works 41 hours in a particular week, he is owed his salary for 35 hours -- $200, 5 hours' pay at $ 5.71 per hour for the 5 hours between 35 and 40 -- $28.55, and 1 hour's pay at $ 8.57 for the 1 hour in excess of 40 -- $8.57, or a total of $237.12 for the week.

29 C.F.R. § 778.322 (LEXIS 2015).

The regulations also contemplate a variable workweek arrangement, where the parties agree that the salary covers the employee's straight time up to a certain number of hours per week.  See 29 C.F.R. § 778.323 (LEXIS 2015).  In this situation, if the employee works more than the agreed hours, then the employee is entitled to pay of time and a half for all hours over forty that are also over the agreed hours:

The discussion in the prior section sets forth one result of reducing the workweek from 40 to 35 hours. It is not either the necessary result or the only possible result. As in all cases of employees hired on a salary basis, **the regular rate depends in part on the agreement of the parties as to what the salary is intended to compensate**. In reducing the customary workweek schedule to 35 hours the parties may agree to change the basis of the employment arrangement by providing that the salary which formerly covered a fixed workweek of 40 hours now covers a variable workweek **up to** 40 hours. If this is the new agreement, the employee receives $200 for workweeks of varying lengths, such as 35, 36, 38, or 40 hours. His rate thus varies from week to week, but in weeks of 40 hours or over, it is $5 per hour (since the agreement of the parties is that the salary

**Page 65 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

> covers up to 40 hours and no more) and his overtime rate, for hours in excess of 40, thus remains $7.50 per hour. Such a salary arrangement presumably contemplates that the salary will be paid in full for any workweek of 40 hours or less. The employee would thus be entitled to his full salary if he worked only 25 or 30 hours. No deductions for hours not worked in short workweeks would be made.

Id.

The regulation further explains what happens when the employer and employee agree to a fixed salary for a workweek that is longer than forty hours. See 29 C.F.R. § 778.325 (LEXIS 2015).  In this situation, the employee is considered to have received straight time for all hours up to the agreed amount. See id. For those hours over forty per week and up to the agreed number of hours that the salary is intended to compensate, the employee receives half (0.5 times) the regular rate for those hours as overtime compensation. See id. However, for all hours that are over forty and over the agreed hours that the salary is intended to compensate, the employee receives 1.5 times the regular rate. See id. These principles are illustrated by the example in the regulation:

> If an employee whose maximum hours standard is 40 hours was hired at a fixed salary of $275 for 55 hours of work, he was entitled to a statutory overtime premium for the 15 hours in excess of 40 at the rate of $2.50 per hour (half-time) in addition to his salary, and to statutory overtime pay of $7.50 per hour (time and one-half) for any hours worked in excess of 55. If the scheduled workweek is later reduced to 50 hours, with the understanding between the parties that the salary will be paid as the employee's nonovertime compensation for each workweek of 55 hours or less, his regular rate in any overtime week of 55 hours or less is determined by dividing the salary by the number of hours worked to earn it in that particular week, and additional half-time, based on that rate, is due for each hour in excess of 40. In weeks of 55 hours or more, his regular rate remains $5 per hour and he is due, in addition to his salary, extra compensation of $2.50 for each hour over 40 but not over 55 and full time and one-half, or $7.50, for each hour worked in excess of 55.

**Page 66 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Id.

However, where the employer and employee agree that the employee's salary covers all the employee's straight time hours, no matter how many hours the employee works, then the Fluctuating Work Week method ("FWW") of calculating the regular rate and overtime applies.  See Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580 (1942) (explaining that "[w]here the employment contract is for a weekly wage with variable or fluctuating hours," the regular rate is determined by dividing the fixed salary by the number of hours actually worked each week); Madden v. Lumber One Home Ctr., No. 4:10CV01162 JLH, 2013 U.S. Dist. LEXIS 30028 at *8 (E.D. Ark. Mar. 5, 2013) ("The fluctuating workweek method calculates the hourly rate of pay for an employee who is paid a salary and who works varying hours per week by dividing the weekly wage by the total number of hours that the employee worked in a given week . . . ."); 29 C.F.R. § 778.114 (LEXIS 2015) (full quotation in footnote).[27]

---

[27]    An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.  29 C.F.R. § 778.114.

**Page 67 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

For this method to apply, the employer and employee must agree that "the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours **or some other fixed weekly work period** . . . ."  29 C.F.R. § 778.114; accord, Madden, 2013 U.S. Dist. LEXIS 30028 at *10 ("the factual issue with respect to whether the plaintiffs' damages should be calculated using the fluctuating workweek method is whether the employer and employee agreed that the salary was intended to compensate for all hours worked or only for forty hours per week"); Urnikis-Negro v. American Family Prop. Servs., 616 F.3d 665, 680 (7th Cir. 2010) (noting that determining the parties' intent as to whether the salary covered fluctuating hours or a fixed number of hours is a factual issue).

If the FWW applies, then the regular rate is determined by dividing the agreed salary by number of hours actually worked in each workweek.  See Missel, 316 U.S. 572, 580 (explaining that "[w]here the employment contract is for a weekly wage with variable or fluctuating hours," the regular rate is determined by dividing the fixed salary by the number of hours actually worked each week); Urnikis-Negro, 616 F.3d at 674; Madden, 2013 U.S. Dist. LEXIS 30028 at *8 ("The fluctuating workweek method calculates the hourly rate of pay for an employee who is paid a salary and who works varying hours per week by dividing the weekly wage by the total number of hours that the employee worked in a given week rather than by forty.") (citing Urnikis-Negro). Further, an employee is entitled only to .5 of the regular rate for hours over 40. Madden, 2013 U.S. Dist. LEXIS 30028 at *9.

**Page 68 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Under the FWW, the point of the half-time premium multiplier is to give effect to the parties' intent that the salary is straight time compensation for any and all hours worked, regardless of whether the employee's hours fluctuate from week to week.  See Madden, 2013 U.S. Dist. LEXIS 30028 at *9 ("assuming that the fixed weekly wage is compensation for all hours worked, including hours in excess of forty per week, the overtime rate is reduced from 150% of the regular rate to 50% of the regular rate").  The employee is assumed to have already received the 1.0, or the full regular rate, under Section 207 of the FLSA, which requires payment of 1.5 times the employee's regular rate for all hours over forty, leaving only the 0.5 overtime premium to be paid as damages.  See id.

> 2.    Each Plaintiff's salary as an SLB Driver was intended to compensate each plaintiff for 60 hours per week.

Each Plaintiff's salary as an SLB Driver was intended to compensate each Plaintiff for 60 hours per week.  See Alexander Dep. 25:13–26:6 (explaining that T&T told him that the SLB Driver job would be $1,400.00 per week, five days per week, twelve hours per day); Davis Dep. 28:25–29:4; (same); Utley Dep. 37:10–14 (same); Houpt Dep. 32:16–23 (explaining that T&T told him that the SLB Driver job would be $1,200.00 per week, five days per week, twelve hours per day); Phillips Dep. 27:10–28:5 (five, twelve hour days); Schroeder Dep. 77:19–23 (same); Howland Dep. 45:14–17 (same); see also Pritchard Dep. 53:25–54:6 ($1,400.00 per week, five days per week); McNeal Dep. 28:14–17 (same).  T&T consistently told Plaintiffs that the SLB Driver job paid $1,400.00 per week for five days per week and twelve hours per day.  See id.

**Page 69 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

Because the parties agreed that the salary would covered Plaintiffs' straight time pay for a fixed number of hours, as opposed to whatever number of hours Plaintiffs happened to work from week to week, the regular rate and overtime rate are calculated in accordance with 29 C.F.R. § 778.113 and 29 C.F.R. § 778.325.   First, because Plaintiffs salary was intended to compensate them for up to sixty hours per week, the regular rate is determined by dividing the applicable weekly salary by 60.   Further, because the parties agreed and intended the salary to cover 60 hours, the overtime rate is determined as follows: (1) For all hours over 40, up to 60 hours per week, Plaintiffs are entitled to 0.5 of the regular rate, and (2) for all hours over 60, Plaintiffs are entitled to 1.5 of the regular rate.   See 29 C.F.R. § 778.325 ("If an employee . . . was hired at a fixed salary of $275 for 55 hours of work, he was entitled to a statutory overtime premium for the 15 hours in excess of 40 at the rate of $2.50 per hour (half-time) in addition to his salary, and to statutory overtime pay of $7.50 per hour (time and one-half) for any hours worked in excess of 55.).

Accordingly, the FWW does not apply because Plaintiffs and T&T agreed that the salary would compensate Plaintiffs for a fixed number of hours per week, 60 hours, rather than all hours worked regardless of how many.   See 29 C.F.R. § 778.113 (explaining that rates are determined based on hours that salary was intended to compensate), 29 C.F.R. § 778.325 (same); Madden, 2013 U.S. Dist. LEXIS 30028 at *10 ("the factual issue with respect to whether the plaintiffs' damages should be calculated using the fluctuating workweek method is whether the employer and

**Page 70 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

employee agreed that the salary was intended to compensate for all hours worked or only for forty hours per week").

## IX.      CONCLUSION

For all the foregoing premises, Plaintiffs respectfully request this Court to grant Plaintiff's Motion for Partial Summary Judgment in its entirety.

Respectfully submitted,

**RICHARD ALEXANDER, BENNIE COLLUM, DON DAVIS, DUANE GRIMES, JOHN HOUPT, JOHN HOWLAND, JASON PHILLIPS, DWAYNE PRITCHARD, RANDY SCHROEDER, KYLAN UTLEY and ROBERT McNEIL, PLAINTIFFS**

SANFORD LAW FIRM, PLLC
ONE FINANCIAL CENTER,
650 S. SHACKLEFORD SUITE 411
LITTLE ROCK, ARKANSAS 72211
TELEPHONE: (501) 221-0088
FACSIMILE: (888) 787-2040

By:    Joshua West
       Ark. Bar No. 2012121
       west@sanfordlawfirm.com

and:   /s/ Josh Sanford _____
       Josh Sanford
       Ark. Bar No. 2001037
       josh@sanfordlawfirm.com

**Page 71 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**

## <u>CERTIFICATE OF SERVICE</u>

I, Josh Sanford, hereby certify that, on the date imprinted by the CM/ECF system, the foregoing BRIEF IN SUPPORT was filed via the CM/ECF system, which will provide notice to the following attorneys of record:

Brent Langdon, Esq.
blangdon@ldatty.com
Melissa G. McPherson, Esq.
lisam@ldatty.com
LANGDON DAVIS, L.L.P.
5902 Summerfield, Suite A
Texarkana, Texas 75505-5547
Telephone: (903) 223-3246
Facsimile: (903) 223-5227

Samuel Zurik III, Esq.
Robert P. Lombardi, Esq.
THE KULLMAN FIRM, P.L.C.
1100 Poydras Street, Suite 1600
New Orleans, LA 70163
Telephone: (504) 524-4162
Facsimile: (504) 596-4189
E-Mail: sz@kullmanlaw.com
E-Mail: rpl@kullmanlaw.com

/s/ Josh Sanford
**Josh Sanford**

**Page 72 of 72**
**Richard Alexander, et al. v. Tutle and Tutle Trucking, Inc., et al.**
**U.S.D.C. (E.D. Ark.) No. 4:13-cv-650-BSM**
**Brief in Support of Plaintiffs' Motion for Partial Summary Judgment**